# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## DECEMBER SESSION, 1996

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 03C01-9510-CR-00299** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **KNOX COUNTY** |
| **VS.** | ) | |
| | ) | **HON. RAY L. JENKINS** |
| **JOHN D. JOSLIN,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Second Degree Murder) |

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF KNOX COUNTY

<u>FOR THE APPELLANT</u>:

HERBERT S. MONCIER
DAVID S. WIGLER
Suite 775 Nations Bank Center
550 Main Avenue
Knoxville, TN 37902

<u>FOR THE APPELLEE</u>:

JOHN KNOX WALKUP
Attorney General and Reporter

MICHAEL J. FAHEY, II
Assistant Attorney General
450 James Robertson Parkway
Nashville, TN 37243-0493

RANDALL E. NICHOLS
District Attorney General

ROBERT JOLLEY
Assistant District Attorney General
City-County Building
Knoxville, TN 37902

OPINION FILED _____

CONVICTION AFFIRMED; SENTENCE MODIFIED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, John D. Joslin, appeals as of right pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. He was convicted by a Knox County jury of second degree murder.[1] The trial court sentenced him as a Range I standard offender to twenty-three years with the Department of Correction. In this appeal, the Defendant raises the following issues:[2]

> 1) Whether the trial court erred in failing to grant the Defendant's motion for judgment of acquittal and whether the evidence is sufficient to sustain his conviction;
>
> 2) whether the jury instruction on self-defense was erroneous;
>
> 3) whether the trial court erred by permitting the Defendant to be impeached on cross-examination with questions concerning pretrial preparation with his attorney;
>
> 4) whether the trial court's erroneous evidentiary rulings deprived the Defendant of his right to present an effective defense;
>
> 5) whether the trial court's demeanor and conduct exhibited a judicial bias denying the Defendant due process of law;
>
> 6) whether the assistant district attorney general committed prosecutorial misconduct; and,
>
> 7) whether the trial court erred in sentencing the Defendant to twenty-three years imprisonment.

After carefully reviewing the extensive record, we conclude that the Defendant's issues provide no grounds for the reversal of his conviction. We do, however, conclude that the trial court erred in sentencing the Defendant to twenty-three years imprisonment. Accordingly, we affirm the Defendant's conviction for second degree murder but modify his sentence.

---

[1] Tenn. Code Ann. § 39-13-210(a).

[2] We have listed the issues in a different order than they are presented in the Defendant's brief. We have chosen to address the issues in the order listed here.

## I. FACTUAL BACKGROUND

The record in this case is quite lengthy. The trial commenced on June 26, 1995. The jury returned a verdict on July 17, 1995. We begin here with a brief summary of the evidence presented, but we will provide additional pertinent facts related to specific issues as we address those issues. There is no question that on February 26, 1994, the Defendant shot and killed the victim, Rodney Shepard. The principal issue raised by the proof adduced at trial was whether the Defendant acted in self-defense or defense of a third person.[3]

## A. State's Proof

At trial, the State presented the testimony of four witnesses to the shooting. Gary Massengill was riding as a passenger with the victim in the latter's truck on the morning of February 26, 1994. Massengill testified that he and the victim were going on a plumbing service call in Powell, Tennessee when they passed the intersection of Central Avenue Pike and Callahan Road. They were traveling north on Central Avenue Pike. As they proceeded through the intersection, Massengill saw a blue and silver van run the stop sign at the intersection and turn from Callahan Road into the lane in which he and the victim were driving. Massengill recognized the van as one belonging to the Defendant. Massengill testified further that shortly after turning toward the truck, the van lightly bumped the victim's truck from behind. The victim stopped the truck and exited the vehicle to investigate while Massengill remained in the truck. According to

---

[3] Tenn. Code Ann. §§ 39-11-611, -612.

Massengill, the van and the truck were approximately twenty feet apart. Massengill then heard two gunshots in quick succession followed by a third gunshot a second later. When Massengill heard the shots, he looked in the side-view mirror and saw the victim lying on the street with blood coming out of his head. Massengill testified that as the third shot was fired, he saw the Defendant hanging out of the driver's side window of the van. Massengill then drove the truck away from the scene. The van followed soon after him. Massengill turned off Central Avenue Pike after a short distance, and the van continued down the road.

On cross-examination, Massengill admitted that the victim was his best friend. He also admitted that the victim's truck had no rear window so that the only way to see behind the vehicle was by using the side-view mirrors. Massengill testified that he had been drinking with the victim the previous night and had already drunk a sixteen-ounce beer on the morning of February 26. He stated that the bump from the van was so slight that it left no marks on or damage to the bumper of the truck. Massengill also admitted that there were inconsistencies regarding the distance from the victim to the vehicles between his initial statements to police officers and his testimony on direct examination. From his best recollection, Massengill stated that the victim was approximately twenty feet from his vehicle at the time he was shot. Massengill testified further that the distance from the back of the truck to the door of the van was twenty feet.

Judy Allen and her daughter, Michelle Flatt, were in another vehicle at the intersection of Central Avenue Pike and Callahan Road at approximately 1:00 p.m. on February 26, 1994. Flatt was driving and Allen was in the front

passenger seat. Both individuals testified that they saw a blue and silver van traveling east on Callahan Road in the right-hand lane. The van switched lanes suddenly as it approached the stop sign at the intersection and turned north (left) onto Central Avenue Pike without stopping. Allen looked away for a moment. When she looked up again, she saw the victim's truck and the Defendant's van stopped in the northbound lanes of Central Avenue Pike approximately five to six feet apart. The victim was walking toward the van with the tips of the fingers of his left hand in his pants pocket and his right arm swinging casually at his side. When the victim reached the front bumper of the van, Allen saw two arms holding a pistol emerge from the driver's side window of the van. She then heard a gunshot and looked away for a second, during which time she heard another gunshot. When she looked back at the scene, she witnessed the Defendant lean out of the van's window and shoot at the victim as he lay on the ground beside the van's window. On cross-examination, Allen admitted that, based solely on her observation of the victim's actions, she believed there was going to be some type of fight after the vehicles came to a stop in the road.

Michelle Flatt testified that the truck and the van stopped approximately three to four feet apart on Central Avenue Pike. Flatt, like Allen, testified that the victim walked back toward the van with the tips of the fingers of his left hand in his pants pocket and his right arm swinging by his side. As the victim stepped past the front bumper of the van, Flatt saw the Defendant put both arms outside the van window. She then heard gunshots. Flatt echoed Allen's testimony that the Defendant leaned out of the van's window and shot at the victim as he lay on the street. On cross-examination, Flatt stated that she also believed there was going to be some type of fight after the truck and the van had stopped. Flatt

admitted that, shortly after the shooting, she told police officers she could not tell whether the van had hit the truck. Flatt also admitted that the Defendant shot the victim as the latter reached the driver's side window of the van.

Phillip Murphy was traveling north on Central Avenue Pike near the intersection with Callahan Road on February 26, 1994. On direct examination, Murphy testified that he saw the Defendant's van bump the victim's truck from behind. According to Murphy, the victim exited the truck and examined his bumper. The victim then walked toward the van, talking and gesturing with his hands. Murphy testified that he believed there might be an altercation. As the victim approached the van, Murphy saw arms emerge from the driver's side window. The victim was still six to eight feet away at that time and, according to Murphy, his arms and hands were up in the air. Murphy then heard two or more gunshots and saw the victim fall forward onto the street.

On cross-examination, Murphy admitted that he was a childhood friend of the victim. In fact, the victim referred individuals to Murphy's heating and cooling business. Murphy testified further that the victim appeared angry and upset as he approached the van. He also admitted that he had not actually seen the van bump the truck, but rather had seen the truck jolt. Murphy assumed that there had been contact between the vehicles. He stated that he did not know whether the victim had suddenly hit his brakes. During cross-examination, the Defendant produced a tape recording of a 911 call made by Murphy immediately after the shooting. On that tape recording, Murphy makes no mention of a bump between the vehicles and states that he could not determine whether the driver of the van was black or white.

Dr. John Neff testified regarding the cause of the victim's death. The victim had a single gunshot wound to the head. The path of the bullet ran roughly parallel to the level of the victim's ears and carried it straight through the brain. Dr. Neff testified further that there was no stippling associated with the wound. Stippling refers to the effect of powder and other bits of material in the shell casing actually impacting the wound site when a weapon is discharged at close range. He explained that the lack of stippling indicated that the shot was fired from at least eighteen to twenty-four inches away from the victim.

Two officers with the Knox County Sheriff's Department, James Phillips and John Wilson, testified that they arrived at the scene shortly after the shooting. After speaking with several witnesses, they learned that the suspect had been driving a blue and silver van. They then began to search the neighborhoods surrounding the scene for such a vehicle. As they were questioning an individual in the Heiskell Road area, the Defendant approached them on foot, identified himself as John Joslin, and stated that he owned a blue and silver van. Both officers testified that the Defendant appeared distraught or in shock. Officers accompanied him back to his residence.

Mike Lett, a detective with the Knox County Sheriff's Department, testified that he went to the Defendant's residence on the afternoon of February 26, 1994. Once he had arrived, the Defendant's wife, Sandra Joslin, informed Lett of the location of a pistol belonging to them. Lett recovered the .38 caliber revolver from the eave of the carport at the Defendant's home. The pistol was not loaded at that time. Lett also testified that police had taken measurements of the crime

scene. There were blood stains on Central Avenue Pike approximately one hundred thirty-six feet from the intersection with Callahan Road.

Mike Upchurch, a detective with the Knox County Sheriff's Department, testified concerning a conversation he had with the Defendant on August 14, 1993. The Defendant had complained about harassing telephone calls and vandalism committed by an individual the Defendant believed to be Rodney Shepard, the victim. The Defendant asked Upchurch about the possible penalties for such offenses and the proof required. When informed that the offenses he was describing were misdemeanors punishable by up to eleven months and twenty-nine days in jail, the Defendant stated that he did not believe that type of punishment "would bother Mr. Shepard at all." According to Detective Upchurch, the Defendant "said that he guessed he'd just take care of it hisself."

On cross-examination, Upchurch confirmed that the Defendant called their office on the Monday after he had spoken with Upchurch and talked with Lieutenant Johnson about the telephone calls and vandalism. In addition, the Defendant called yet again on a later date and spoke with Officer Baird. Upchurch testified further that he was aware that the Defendant also approached the district attorney general's office. Defense counsel produced a report written by Detective Lett which stated that Upchurch had informed the Defendant in August of 1993 that, given the offenses the Defendant had described and the level of his proof, "they probably wouldn't do much to the subject because of this, that he didn't know whether he could get a warrant or not."

## B. Defense Proof

## 1. Testimony of the Defendant

The Defendant testified in his own behalf at trial. He stated that he had met the victim in 1988. The Defendant was adding a bedroom to his house at that time. The victim had posted homemade signs throughout the community advertising that he did plumbing work. After reading these signs, the Defendant called the victim and eventually hired him to work on his bedroom addition. The Defendant testified that the victim did good work at a reasonable price. This arrangement began a relationship which was initially amicable. The Defendant often asked the victim to do repair work at his commercial rental properties. The victim accepted these jobs and did quality work according to the Defendant.

The Defendant and the victim became closer friends as time passed, and the Defendant visited the victim's home on Sam Tillery Road. He testified that he found the living conditions deplorable and thought the victim and his family deserved better. The victim informed him that he did not like his living conditions either, and that the neighborhood children were harassing his children. The victim eventually asked the Defendant if he would buy a house on Dante Road and rent it to him. The Defendant agreed.

Apparently the Dante Road home was in such a condition that it would not qualify for a loan. The Defendant therefore sold his retirement stock in order to have the money to purchase the home on Dante Road. He also executed an option to allow the victim to purchase the home from him during the next three years. The Defendant stated that they had agreed that the victim would renovate the electrical and heating systems so that the Dante Road home would qualify

for a loan. The victim would then get a loan and purchase the house from the Defendant. According to the Defendant, the victim began several renovation projects on the house, but did not finish them. The Defendant loaned the victim money to finish some projects, but to no avail.

The victim eventually expressed a desire to move into a large garage-type commercial building owned by the Defendant. The Defendant discovered that this structure was not approved as suitable for habitation. He informed the victim that his family could not move into the building and, according to the Defendant, the victim became angry. The victim suddenly became "unavailable" to do repair work at the Defendant's commercial properties.

The victim later moved his trailer-home onto the back half of the Dante Road lot. He then requested that the Defendant give him the half of the lot surrounding the trailer. The Defendant inquired of the Knox County Planning Commission and was informed that the lot could not be split into two residential lots because of a lack of square footage. He told the victim what he had learned. The victim became upset and said he was simply going to sell the trailer for one thousand dollars ($1,000). The Defendant told the victim that the trailer was worth much more money and wrote him a check for two thousand five hundred dollars ($2,500). The victim later tore that check into pieces.

The victim then began to complain about his neighbors around the Dante Road home. He asserted that his children were being harassed. The Defendant heeded the victim's displeasure with his home and told him that if he completed the renovations to get the house into selling condition (such that it would qualify

for a loan), the Defendant would give him any amount over thirty-six thousand dollars ($36,000) for which the home sold. The Defendant also offered to pay for the renovation materials and for an individual to help the victim complete the repairs.

Soon after this offer, in February of 1992, the Defendant learned that the victim had purchased a nearby home on Bruin Road. The Defendant received a telephone call from one of the victim's neighbors on Dante Road informing him that the victim was gutting the Dante Road home as he moved out. The Defendant went to the Dante Road home and discovered that the victim was removing fixtures, duct work, the external air conditioner unit, and other materials from the Dante Road home. When asked about the air conditioner, the victim told the Defendant that he was taking the unit away from the Dante Road home because it was stolen. The Defendant testified that he did nothing about the gutting of the house because he did not want any trouble from the victim. He then began to talk to the victim's Dante Road neighbors and learned that the Shepard family had been harassing and threatening them. The neighbors also suspected the victim of being involved in selling illegal drugs. The Defendant called the city police department and learned that the victim had a criminal record. The Defendant testified that he was terrified to learn these things about the victim.

On October 28, 1992, the Defendant sold the Dante Road home to Carroll Votaw. Shortly thereafter, he and his wife received a telephone call from the victim. The victim was angry and vulgar, cursing the Defendant and saying that he "was going to destroy" the Defendant and everything he owned. The victim

went on to threaten to kill the Defendant and warned him that he "better keep an eye over his shoulder." The victim also stated that "he was going to post signs up in the community declaring all about John Joslin." He told the Defendant's wife that the Defendant had raped someone in the 1940s.

The Defendant testified that from this date until the day of the shooting, he received numerous vulgar and harassing telephone calls, some of which he was able to record on his answering machine. Included in the calls were threats to rape the Defendant's wife and daughter. He also discovered damage to several pieces of his commercial rental property located throughout the community. The calls and vandalism were apparently cyclical, with several instances occurring over a short period of time, usually over a weekend, followed by a period of no disturbances. The victim would often call near the time of the discovery of acts of vandalism and tell the Defendant, "It ain't over, S.O.B.; it ain't over."

The Defendant soon became very frightened of the victim. He would sometimes ask one of his adult sons to accompany him when he went to work on his commercial property. He testified that he called the police several times and learned that there was little that could be done about the harassing calls and vandalism unless he caught the perpetrator in the act. The Defendant also approached the local telephone company to inquire whether there was a way to stop or "trap" calls coming into his phone from a specific number. According to the Defendant's testimony, he was told that he could not "trap" calls from the victim's number because it was outside his local exchange. As time passed, the Defendant became more afraid, both for himself and for his family. He and his

wife eventually instituted strict rules regarding answering the phone and the door if his children were home alone.

Approximately one to two weeks before the shooting, one of the Defendant's neighbors discovered a homemade sign posted near the Defendant's home. The Defendant soon discovered more signs and writing of the same nature on various public signs. The signs and writings contained language such as "beware John Joslin," often coupled with "John Joslin the rapist." Some signs contained language such as "John Joslin will rape your wife" or "John Joslin will fuck you." Photographs of these signs were introduced at trial. The Defendant testified that he recognized the victim's handwriting on some of the signs. He believed that the signs indicated the victim was "coming closer." As a result, the posting of the signs scared the Defendant.

With regard to the day of the shooting, the Defendant testified that he awakened early on Saturday, February 26, in order to search for more signs before other people began to drive in the neighborhood. He took a loaded pistol with him for protection purposes and drove through the neighborhood near his home. For the past twelve years, the pistol had usually been kept in a locked closet in his house. The Defendant found more signs that morning and recognized the Defendant's handwriting on them. He also found vulgar writing on the garage door of his adult son's place of business. He returned home later that morning to get ready to attend his adolescent son's church-team basketball game.

The Defendant's daughter was feeling ill that morning and decided to stay at home during the basketball game. The Defendant instructed his daughter not to answer the phone or come to the door while they were gone. When the Defendant arrived at the gymnasium, he and his wife spoke with the youth minister of their church, Randy Singleton, about the problems they had been having with the victim. After the game, the Defendant and his wife left quickly to check on their daughter. Their son was going to come home separately a short time later.

They approached the intersection of Callahan Road and Central Avenue Pike, traveling east on Callahan in the left lane. The Defendant intended to turn left on Central Avenue Pike to get back to his home on Heiskell Road, which was a short distance north from the intersection of Central Avenue Pike and Callahan. As he approached, he saw the victim's truck at the intersection heading north on Central Avenue Pike. Believing that the victim would turn west (left) onto Callahan Road in order to get to the interstate, the Defendant switched into the right lane of Callahan Road hoping to avoid the victim. The Defendant testified that the victim saw him approaching and "creeped" through the intersection, giving him an "angry stare." Rather than turning onto Callahan Road as the Defendant had expected, the victim continued straight through the intersection, traveling north on Central Avenue Pike.

The Defendant became worried that the victim was going to the Defendant's home, which was in the direction the victim was driving. He therefore switched back into the left lane of Callahan Road and turned left at the intersection so that he was traveling north on Central Avenue Pike behind the

victim's truck. He stated that he stopped at the intersection, but the stop sign was set back a short distance from the actual intersection of the roadways. The Defendant testified that just after he turned into the lane following the victim's truck, the victim slammed on his brakes and came to a stop in the middle of the road. The Defendant slammed on his brakes to avoid hitting the truck. At no time did he make contact with the victim's truck.

According to the Defendant's testimony, the victim jumped out of his truck, slammed the door and threw down a cigarette. He placed his hand in his pocket and approached the Defendant's van. At this point, the Defendant's wife screamed, "He's coming to kill us, John." The Defendant reached into the console beside his seat and pulled out the .38 caliber revolver he had left there earlier that morning. He "stuck it out the window" and said, "No, Rodney." The Defendant testified that the victim responded, "I'll kill you, motherfucker." The Defendant then fired a shot in the air over the victim's head. The victim lunged for the Defendant, reaching into his window and tugging at the Defendant's arm or safety belt. The Defendant leaned back and fired the gun twice.

The victim fell back from the van after the shots, but the Defendant did not know whether he had wounded the victim. At this time, the Defendant's wife exclaimed, "My God, John, here's the other one coming after us." The Defendant looked up to see Gary Massengill exiting the victim's truck. Massengill ran around to the driver's side of the truck and drove away. The Defendant followed the truck because it was traveling toward their home. The truck eventually turned off the road, and the Defendant proceeded to his house. The Defendant testified that he was in a state of shock after the shooting.

Once home, the Defendant did not return the .38 caliber pistol to its customary storage location inside the house. Instead, he placed the revolver on a ledge in his carport because he did not want his daughter to see him carrying the gun. He then told his wife that he was going to the Sheriff's Office to inform the authorities of what had happened. The Defendant's wife asked him to wait and to call an attorney before going. Since they did not know any attorneys, they called the minister of their church, who gave them the name of a lawyer. The minister told them he was coming to their home immediately. During this time, the Defendant noticed that police officers were at the home of one of his neighbors. He decided to approach the officers. Upon doing so, he informed the officers of his name and the fact that he owned a blue and silver van. Lieutenant Don Humphrey, whom the Defendant had known for a number of years, told the Defendant, "If you know anything about this situation, you had better go talk to you an attorney."

On cross-examination, the Defendant admitted that he did not consider the signs and vulgar writings threatening in and of themselves. Instead, he considered them to be more in the nature of harassment rather than threats. He did, however, believe them to be more of a threat when they began to be posted near his home. The Defendant was also confronted with a letter written to him by the victim in which the victim made many positive comments about and showed a concern for the Defendant and his family. The letter was supposedly written in late 1992 or early 1993, after the Defendant had received the threatening telephone call concerning his sale of the Dante Road home. The Defendant testified further that he did not remember doing anything to the revolver as he drove away from the scene of the shooting.

The assistant district attorney general also questioned the Defendant about whether he had rehearsed his testimony with his attorney as part of his pretrial preparation for the case. These questions, in turn, led to inquiries into whether the Defendant had been through a trial procedure before, referring to misdemeanor convictions that the Defendant received in 1973. This line of questioning is challenged by the Defendant on appeal. We will relate additional facts regarding these questions as we address those issues later in this opinion.

## 2. Corroborating Proof

The Defendant presented several witnesses to corroborate his testimony concerning the history between him and the victim as well as the events leading up to the shooting. James McCreary, one of the Defendant's neighbors, testified that he saw a homemade sign posted on a telephone pole approximately one hundred fifty yards away from the Defendant's home. The sign contained derogatory remarks about the Defendant. MrCreary removed the sign from the pole and took it to the Defendant. The Defendant became visibly shaken, upset, and nervous when he saw the sign. McCreary testified that the Defendant then told him about the vulgar and harassing telephone calls he and his family members had received from the victim. McCreary considered the sign to be threatening and seeing it in his neighborhood worried him. He later saw derogatory writing on stop signs in the neighborhood. On cross-examination, McCreary admitted that he had not seen the individual who had posted the sign on the telephone pole.

Lisa Scarbro testified that she worked at the Powell Deli. That building is owned by the Defendant and is apparently leased to the operators of the deli.

Scarbro testified that she does not know the Defendant. She confirmed that she once saw vulgar and derogatory writing referring to the Defendant on an exterior wall of the deli. On cross-examination, Scarbro admitted that she did not know who wrote on the wall.

Charles Edward Wright testified that he leased a building from the Defendant. One morning in 1992 he discovered that the exterior air conditioning unit had been knocked off its base. It appeared to Wright that the unit had been struck by a vehicle. Wright later spoke with the Defendant about the problems with the victim. Wright testified that the Defendant appeared to be fearful of the victim.

Dudley Cockrum testified that he was the minister at the Defendant's church. He had talked with the Defendant about the problems with the victim. Cockrum advised the Defendant to speak with the Sheriff's office. The Defendant told Cockrum that he had already done so. Cockrum testified further that the Defendant appeared to be afraid of the situation and seemed to feel trapped. Cockrum also confirmed that he received a telephone call from the Defendant on February 26, 1994, and gave the Defendant the name of an attorney.

Carroll Votaw testified that he purchased the home on Dante Road in October of 1992 after the victim and his family had moved. According to Votaw, the house was in extremely poor condition. Votaw called the victim to ask about information on the fixtures and duct work that had been removed from the home. He testified that the victim seemed more interested in the purchase agreement he had made with the Defendant. The victim appeared to be very angry with the

Defendant.  Votaw testified that the victim stated that the situation was far from settled and that "he probably would wind up killing the son-of-a-bitch."  Votaw later spoke with the Defendant about the situation and stated that the Defendant was obviously scared.  According to Votaw, the Defendant became more and more fearful as time passed.

Ernest Greer testified that he was the Defendant's uncle.  Greer spoke with the Defendant about the problems the latter was having with the victim.  Greer could not remember exactly when their conversations had occurred, but estimated them to have taken place six to ten months before the shooting.  Greer related that the Defendant had stated that the vulgar graffiti and signs were in the same language as the harassing telephone calls he had received.  On cross-examination, the assistant district attorney general asked Greer if he realized the Defendant had testified that the graffiti and signs appeared only weeks before the shooting, rather than six to ten months.  Greer then stated that he could not be sure about the timing of their conversations because he was eighty-three years old and could not remember everything.

The Defendant's children also testified at trial.  Dean Joslin, the Defendant's son, testified that he operated an automotive repair garage out of a building leased to him by his father.  Dean Joslin arrived at the garage one morning after his father had begun to have problems with the victim and found that his garage door had been severely dented by a vehicle.  He found red paint matching the color of the victim's truck on the scene.  He took measurements of the height of the dent and concluded it corresponded to the height of the bumper on the victim's truck.  Dean Joslin also testified that a plate glass window was

broken twice during this time. On the morning of Saturday, February 26, 1994, Dean Joslin discovered vulgar writing referring to the Defendant on the garage doors of his shop. Dean Joslin stated that he had conversations with his father about the situation with the victim. He testified that the Defendant was in constant fear of the victim. On cross-examination, Dean Joslin admitted that in his deposition for a civil case arising from the shooting, he stated that the Defendant was not "scared to death" of the victim.

Daniel Charles Joslin, another son of the Defendant, echoed Dean Joslin's testimony about his father's mental state. He testified that the Defendant was terrified of the victim. Benjamin Allen Joslin also testified that the Defendant was scared of the victim. Benjamin Allen Joslin stated that his father spoke with him about the vandalism and harassing telephone calls. Those conversations began approximately one year before the shooting.

John Isaac Joslin and Geneva Rose Joslin, the adolescent children of the Defendant, both testified that they answered harassing telephone calls in which the victim used vulgar and threatening language. They spoke with the Defendant about the telephone calls they received. They both testified that the Defendant appeared to be scared. In fact, the entire family was fearful and felt like they were being stalked. On cross-examination, John Isaac Joslin admitted that he remembered receiving only seven or eight harassing calls from the victim. Geneva Joslin remembered two calls distinctly, but testified that she received more calls which she simply could not remember.

Randy Singleton, the youth minister at the Defendant's church, testified that he saw the Defendant and his wife shortly before a basketball game on the morning of Saturday, February 26, 1994. He cordially asked the Defendant how he was doing. After an initial pleasant answer, the Defendant's wife began to cry and the Defendant confided in Singleton that they were not doing well. The Defendant told Singleton that his family was being persecuted by a man. The Defendant related that they had received harassing telephone calls and had discovered derogatory signs posted in their neighborhood. Singleton testified that the Defendant's hands were shaking as he recounted this information. In Singleton's opinion, the Defendant appeared very frightened. On cross-examination, Singleton admitted that the Defendant never specifically told him that he was fearful of the victim.

The principal witness offered to corroborate the Defendant's testimony about the events leading up to the shooting was the Defendant's wife, Sandra Joslin. Sandra Joslin testified that she and her husband received a threatening telephone call from the victim on October 28, 1992, after the sale of the Dante Road home to Carroll Votaw. From that time until the shooting, members of the Joslin family continued to receive vulgar and threatening telephone calls from the victim. According to Sandra Joslin, these calls included threats to rape her, threats to rape Geneva Joslin, and threats to kill the Defendant. Approximately a week before the shooting, one of their neighbors brought them a homemade sign containing derogatory, vulgar writing referring to the Defendant. The neighbor had found the sign posted on a pole very near their home. The close proximity of the sign to their home frightened her and her entire family.

Sandra Joslin confirmed that on the morning of Saturday, February 26, 1994, she and her husband attended their son's church basketball game. Their daughter remained at home because she was ill. On the return home from the game, her husband was driving their van and she was in the front passenger seat. They were traveling east on Callahan Road approaching the intersection with Central Avenue Pike. The Defendant was driving in the left lane and intended to turn left at the intersection, which would take them directly toward their home. As they neared the intersection, she saw the victim's truck. Her husband switched into the right lane, which automatically turns south (right) onto Central Avenue Pike, in order to avoid passing close to the victim's truck. The victim drove slowly through the intersection in the direction of their home and stared at them. Given that their daughter was at home alone, this action alarmed Sandra Joslin and her husband, prompting her husband to switch lanes again and turn left at the intersection, following the victim's truck as it proceeded north on Central Avenue Pike.

After a short distance, the victim suddenly slammed on his brakes and came to a stop in the road. The Defendant slammed on his brakes to avoid hitting the truck from behind. According to Sandra Joslin's testimony, the victim "jumped out of his truck and started bounding back toward our vehicle in a very mad rage. He ran his hand in his pocket and continued toward our vehicle." As the victim continued toward the van, Sandra Joslin exclaimed, "He's going to kill us." She heard her husband say, "No, Rod" and saw him stick his revolver out of the van's window. She heard the victim say, "I'll kill you mother--fuckers." At that point, Sandra Joslin ducked down in her seat.

Sandra Joslin then heard gunshots and looked up a moment later. She saw another individual exit the victim's truck. She said to her husband, "John, watch it; there's another one." That individual got back into the truck, however, and drove away. They followed the truck, heading toward their home. After a short distance, the truck turned off the road and they continued to their house. Sandra Joslin testified further that, on the way home, the Defendant removed the bullets which remained in the revolver and threw them out of his window.

On cross-examination, the assistant district attorney made much of Sandra Joslin's testimony that the victim said the plural "motherfuckers" as he approached their van rather than the singular. The assistant district attorney confronted her with a copy of a deposition given for the civil case arising from the shooting in which she stated that the victim used the singular form of the word. After repeated inquiries by the prosecutor, Sandra Joslin testified that she could not be sure whether the victim had used the plural or the singular.

**3. Character of the Victim**

The Defendant also presented several witnesses who testified concerning the character of the victim. Dean Joslin, one of the Defendant's sons, testified that he came to know the victim through his father. The victim eventually was hired to do plumbing work for Dean Joslin. Dean Joslin came to know the victim as time passed, and the victim visited him at Joslin's automotive repair shop. Based on their relationship, Dean Joslin developed the opinion that the victim was an aggressive, violent person. Daniel Charles Joslin, another one of the Defendant's adult sons, also developed a relationship with the victim. He, like

Dean Joslin, testified that the victim was, in his opinion, an aggressive, violent person.

David Riley testified that he was a neighbor of the victim when he lived on Sam Tillery Road, prior to the victim's move to the Dante Road home. Riley stated that, based on his knowledge and observations, the victim had a reputation as a violent, aggressive person. On cross-examination, Riley testified that he did not know the Defendant and had not told the Defendant about his knowledge of the character of the victim.

In one of the more bizarre developments during this trial, the Defendant presented the testimony of Robert Ferguson. Ferguson was married to the victim's sister-in-law and came to know the victim in early 1993. The following colloquy occurred during the direct examination of Ferguson.

Q. Did you hear what other people said about Rodney Shepard?
A. I heard other people say he was a little bit of a hothead when he was drinking.
Q. Well -- okay. I -- I didn't -- I just -- you have heard other people talk about him?
A. Yes, sir.
Q. Sir, do you have an opinion as to the character of Rodney Shepard for being an aggressive person or being a peaceful person?
A. I feel like he was a peaceful person 99 percent of the time.
Q. Was there times when he was an aggressive person, sir?
A. When he was drinking, yeah.
Q. Do you have an opinion, sir, for Rodney Shepard's reputation for being a peaceful person or a violent person?
A. I've heard him make threats about other people and to myself, but I've never known him to actually commit a violent act.
Q. Do you have an opinion as to his reputation for being violent, sir?
A. I don't feel like he was violent.
Q. You don't?
A. No.

Later during the direct examination, Ferguson was asked to describe an incident which occurred at the Shepard home. Ferguson witnessed the victim talking about the Defendant and making a telephone call to the Defendant. Defense counsel questioned Ferguson as follows:

> Q. Okay. What, if anything, happened with regard to John Joslin?
> A. That was the first time I ever heard John Joslin's name, was when I was there.
> Q. How did it come up?
> A. Something was said concerning signs that had been hung up. And Rodney was drinking, and then he made a phone call.
> Q. Would you, please, tell the members of the jury who it was Rodney said he was calling?
> A. John Joslin.
> Q. What did he say as he made that phone call in your presence and in the presence of the people you specified?
> A. He was cussing about John Joslin ripping him off.
> Q. Did he say what he was going to do to John Joslin?
> A. He was screaming and hollering about John Joslin.
> Q. Did he say what he was going to do to John Joslin?
> A. I don't recall any specifics.
> Q. Do you recall him saying to John Joslin "I'm going to kill you, you sonofabitch"?
> A. I don't know if he was actually talking to John Joslin or it was before he answered the phone.
> Q. Do you recall him saying that?
> A. Yes.

Defense counsel then confronted Ferguson with a written statement he had signed shortly before testifying. Ferguson admitted that, in the statement, he stated that he believed the victim to have been a violent, aggressive person during his lifetime.

Although it appears that Ferguson's testimony at trial differed somewhat from his written statement and thus surprised defense counsel to a certain degree, the direct examination was rather ordinary. At the conclusion of direct examination, however, an odd turn of events occurred. Defense counsel requested a jury-out hearing, apparently to alert the trial court that he desired to

ask Ferguson about his knowledge about specific violent acts committed by the victim against third persons. During this hearing, Ferguson asked to address the trial court. Ferguson stated that, during the days before he testified, defense counsel asked him to place matters in a different light when he was testifying. Ferguson also stated that he was "asked to add more to it than what the truth is."

At that point, defense counsel asked that the witness be removed from the courtroom so that they could discuss the matter. Once Ferguson had left the courtroom, defense counsel informed the trial court that he had tape-recorded his conversations with Ferguson. Defense counsel explained that he had originally spoken with Ferguson many months earlier and learned that, according to defense counsel, Ferguson had witnessed violent acts of the victim and was of the opinion that the victim was a violent, aggressive person. Subsequent to their initial conversation, Ferguson pleaded guilty to a bank robbery charge and was incarcerated in a federal penitentiary. He was transported to Tennessee at the beginning of the Defendant's trial in order to testify for the defense.

Prior to Ferguson's testimony, defense counsel learned that an assistant United States attorney had arranged a conversation between himself, Ferguson and the assistant district attorney general prosecuting the Defendant. Defense counsel began to suspect that, in his words, something "was amiss." As a result, defense counsel decided to record the conversations he had with Ferguson. From his comments, it appears that defense counsel believed the tapes would demonstrate that he had not pressured Ferguson in any way nor suggested that

Ferguson exaggerate his testimony. He then offered the written statement and the tape recordings as <u>Jencks</u> material.[4]

At this point, the assistant district attorney general requested that he be permitted to review the original tape recordings alone. Defense counsel stated that he would make a copy of the tapes but did not want to give the originals to the prosecutor. It appears that defense counsel had conferred with Ferguson only a half hour before he testified. Defense counsel stated that he had not had time to copy the tapes yet. It is unclear whether there were any prior meetings between defense counsel and Ferguson (other than their original conversation several months earlier) and whether these meetings were recorded. The trial court ordered defense counsel to allow the prosecutor to review the original tapes alone. Defense counsel refused. The trial court then found that defense counsel had violated Rule 26.2 of the Tennessee Rules of Criminal Procedure. Accordingly, the trial court ordered Ferguson's testimony stricken from the record.

The assistant district attorney general, however, requested that Ferguson's testimony not be stricken, but rather that he be allowed to testify that defense counsel had pressured him. The trial court agreed. As a result, on cross-examination, Ferguson stated that defense counsel had promised that he "would be very well taken care of and compensated" if he testified favorably. Moreover, defense counsel promised that he would file a letter seeking a downward departure in Ferguson's bank robbery sentence. Ferguson testified that defense counsel asked him "[t]o make statements stronger concerning the statements I'd

---

[4] <u>See</u> Tenn. R. Crim. P. 26.2.

made to him in the past, go into further detail, more aggressive detail. Making them more than what they was."

Faced with that testimony on cross-examination, defense counsel sought to ask Ferguson on redirect about details of the written statement and whether they were true or whether they were exaggerated. A copy of Ferguson's signed, written statement had been provided to the prosecutor at the conclusion of direct examination pursuant to Tennessee Rule of Criminal Procedure 26.2. The prosecutor objected "to references to anything because of Mr. Moncier's [defense counsel] actions during the recess." The prosecutor appears to be referring to defense counsel's decision not to allow him to review the original tapes alone. The trial court sustained numerous objections by the prosecutor, curtailing any redirect examination concerning Ferguson's written statement and whether his direct testimony was exaggerated. Defense counsel was able to ask Ferguson, "when I have talked to you on each occasion, and including the lunch recess before this, did I tell you to tell the truth?" Ferguson responded affirmatively.

### 4. Expert Testimony Regarding the Defendant's Mental State

The Defendant also presented expert testimony regarding his mental state through Dr. Eric Engum, a clinical psychologist. Dr. Engum examined the Defendant on three separate occasions after the shooting at the request of the Defendant's treating psychiatrist, Dr. Catherine Gyurik. The trial court allowed Dr. Engum to testify regarding the Defendant's statements to him which formed the basis for his conclusions about mental state. As a result, Dr. Engum related substantially the same history between the Defendant and the victim as well as

-28-

the events leading up to the shooting as the Defendant testified to on direct examination.

Based on what the Defendant told him and the results of psychological testing, Dr. Engum formed an opinion concerning the personality characteristics of the Defendant on February 26, 1994. Dr. Engum testified that the Defendant had passive-aggressive and narcissistic personality features that were pervasive, long-standing and existed throughout his adult life. More specifically, Dr. Engum testified that passive-aggressive individuals tend to be withdrawn and do not confront problems directly. They are not dominant or assertive, but rather tend to allow other people to make major decisions. They also tend to be somewhat ineffective in social situations. Narcissistic individuals are the type of people who "pull themselves up by their own bootstraps." They are self-made and tend not to be particularly well-educated.

Dr. Engum testified further concerning stress and its effect upon people in general as well as on the Defendant. Dr. Engum explained that stress provokes certain autonomic nervous system responses such as increased heart rate and rapid, shallow respiration. Individuals under stress become acutely sensitive to visual and auditory stimuli, but their cognitive processes are limited so that they do not reason in a logical, straightforward fashion. Dr. Engum concluded that, accepting the Defendant's account of the history between him and the victim and the events immediately prior to the shooting, the Defendant was under acute stress at the time of the shooting.

Dr. Engum found that, given the Defendant's personality characteristics and the history between him and the victim (again, as related by the Defendant), the Defendant became increasingly sensitized to the threat posed by the victim as time passed. Dr. Engum concluded that the Defendant had perceived the actions of the victim immediately prior to the shooting to be a threat to his safety.

On cross-examination, Dr. Engum again admitted that his conclusions were based solely on what the Defendant had related to him and his discussions with the Defendant's treating psychiatrist, Dr. Gyurik. Dr. Engum did not consult any of the witnesses to the shooting presented by the State during their case-in-chief, namely Judy Allen, Michelle Flatt, Phillip Murphy or Gary Massengill. In addition, the following colloquy took place:

> Q. Are you aware and did you take it into account in your assessment of Mr. Joslin's perception of stress and fear that Mr. Joslin ran into the back of Mr. Shepard's truck?
> A. I am aware that he bumped into it -- yes, sir. I am aware that he bumped into it when Mr. Shepard stopped.
> Q. Okay. Who told you that?
> A. I believe Mr. Joslin did, and I clearly remember that when Mr. Moncier [defense counsel] and I talked in January, that that was a point that came up.
> Q. So, Mr. Joslin told you that he bumped into the back of Mr. Shepard's truck?
> A. To the best of my recollection, I believe that there was some contact between the two vehicles.

On redirect examination, however, Dr. Engum reviewed the notes he had taken as he interviewed the Defendant and stated that there was no indication in those notes that the Defendant had bumped the victim's truck. Dr. Engum testified that, on reflection, he received information about the bump from a meeting with defense counsel after his interviews with the Defendant. Dr. Engum also reiterated that passive-aggressive individuals such as the Defendant tend not to

address issues directly but rather wait and hope that the issues will resolve themselves.

**5. Testimony Offered to Rebut the State's Proof**

The Defendant also presented the testimony of John Hyde to attack the credibility of the testimony of the State's witnesses to the shooting. Hyde testified that he is a traffic engineer, accident reconstructionist and visual perception (sight distance) expert. Hyde examined the Defendant's van and the victim's truck and concluded that there had been no contact between the vehicles. Hyde based his conclusion on the lack of scratches or markings consistent with contact between the vehicles. He testified further that an individual stopped at the intersection of Callahan Road and Central Avenue Pike would not have been able to see the front of the Defendant's van or the rear of the victim's truck assuming that the vehicles were in the approximate position that had been testified to earlier in the State's case-in-chief. Hyde's testimony apparently refers to the positions of Judy Allen, Michelle Flatt and Phillip Murphy and their lines of sight.

On cross-examination, Hyde admitted that he was an expert witness paid by the defense and had not been at the scene during the shooting. He testified that he had not talked with the State's witnesses to aid him in forming his opinions. He also admitted that he had not examined the victim's truck "up close" but rather from a slight distance.

## C.  State's Rebuttal Proof

In rebuttal, the State presented the testimony of Don Provonsha. Provonsha testified that he was an agent with the Federal Bureau of Investigation.  Provonsha stated that defense witness Robert Ferguson has a poor reputation for truth and veracity. On cross-examination, Provonsha admitted that an assistant United States attorney holds some sentencing consideration power over a federal prisoner such as Robert Ferguson.

Steve Worley, an employee of the Powell Telephone Exchange, also testified for the State in rebuttal.  Worley stated that the telephone company had the technical ability to trace calls throughout Knoxville and the surrounding areas as of November 10, 1992.  Worley testified that he had found no record of complaints from the Defendant about harassing telephone calls, nor had he found any requests from the Defendant to trace calls.  On cross-examination, Worley admitted that the area in which the telephone company could "trap" calls was smaller than the "trace" area.  Worley stated that during the relevant time period, the company could not "trap" calls coming in from outside a localized area such as from Knoxville to Powell.

## D.  Jury Verdict

On May 18, 1994, the Defendant was indicted on one count of first degree murder.  At trial, he pleaded not guilty and asserted self-defense and defense of a third person.  At the conclusion of the proof, the trial court charged the jury on first-degree murder, second degree murder and voluntary manslaughter.  After

considering all of the evidence, the jury found the Defendant guilty of second degree murder.

## II. SUFFICIENCY OF THE EVIDENCE

In the first issue, the Defendant challenges the sufficiency of the convicting evidence in three ways. First, he argues that the evidence was legally insufficient to survive his Rule 29 motion for judgment of acquittal[5] with respect to first-degree murder. Second, he argues that the evidence is legally insufficient to support his second-degree murder conviction. Third, in the event the evidence is not sufficient to support his second-degree murder conviction, he argues that the evidence is also insufficient to support a voluntary manslaughter conviction. Accordingly, the Defendant contends that his conviction must be reversed and the charges against him dismissed.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

---

[5] Tenn. R. Crim. P. 29(a).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. Cabbage, 571 S.W.2d at 835. Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

The Defendant first contends that the evidence was insufficient to survive his Rule 29 motion for judgment of acquittal with respect to the indicted offense of first-degree murder. Rule 29 of the Tennessee Rules of Criminal Procedure provides, in pertinent part, that the trial court "on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses." Tenn. R. Crim. P. 29(a). The standard by which trial courts determine and appellate courts review a motion for judgment of acquittal is essentially the same standard applied when determining the sufficiency of the evidence after a conviction. See Cabbage, 571 S.W.2d at 836; State v. Thompson, 549 S.W.2d 943, 946 (Tenn. 1977); State v. Anderson, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). At the time the motion is made, the trial court must favor the State with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. Thompson, 549 S.W.2d at 946 (citing Jones v. State, 533 S.W.2d 326, 329 (Tenn. Crim. App. 1975));

Anderson, 880 S.W.2d at 726. On appeal, the State is again entitled to the strongest legitimate view of the evidence and any reasonable inferences which might be drawn from it. Cabbage, 571 S.W.2d at 836; Thompson, 549 S.W.2d at 946; Anderson, 880 S.W.2d at 726.

In the case sub judice, the record reveals that at the close of the State's case-in-chief, the Defendant moved for judgment of acquittal on the charge of first-degree murder as well as the other offenses raised by the proof, namely second-degree murder and voluntary manslaughter. The trial court denied the Defendant's motion. The Defendant renewed his motion for judgment of acquittal at the close of all proof, and the trial court again denied the motion.

The principal focus of the Defendant's argument is on the State's burden to negate the Defendant's self-defense and defense of a third person claims beyond a reasonable doubt, as is required under Tennessee Code Annotated section 39-11-201(a)(3). The Defendant admits that he shot the victim and even that he intended to shoot the victim. He maintains, however, that he did so in self-defense and defense of his wife, and that the State failed to negate his defense beyond a reasonable doubt. The Defendant argues that the submission of a first-degree murder charge to the jury prejudiced him by increasing the likelihood of a second-degree murder conviction as a "middle ground."

In considering this issue, affording the State the strongest legitimate view of the evidence and the inferences therefrom as well as accrediting the State's witnesses, we can only conclude that there was sufficient evidence to have survived the Defendant's motion for judgment of acquittal with respect to first-

degree murder. The State's proof revealed that the Defendant erratically switched lanes and disregarded a stop sign to pursue the victim's truck. Gary Massengill testified that the Defendant's van then bumped the victim's truck from behind. The victim exited his truck and approached the Defendant's van, apparently in a manner suggesting that he was upset. As the State pointed out at trial, however, an individual who had just been involved in a car accident might very well be expected to be somewhat upset. As the victim approached the van, witnesses for the State testified that they saw the Defendant point a pistol out of his window and fire at the victim. Two witnesses stated that the Defendant leaned bodily out of his window and fired a shot at the victim as he lay on the ground. After the shooting, the Defendant drove away from the scene and proceeded to his nearby home. Once home, he placed the gun in an eave of his carport, although he normally kept the gun inside his home. The State also presented testimony that the Defendant, after learning that the harassment he had been receiving from the victim constituted only a misdemeanor, stated that he would "take care of it" himself.

The Defendant made his first motion for judgment of acquittal at the close of the State's case-in-chief. At that point, the Defendant's theories of self-defense and defense of another were, as we might expect, somewhat nebulous because they had not been fully developed. The State's proof alone, fully accredited, suggests that the Defendant reacted with frustration and anger to harassment by the victim and his perception that the harassment would not be resolved or punished adequately through normal channels. As a result, the Defendant pursued the victim on the day of the shooting and created an opportunity for a confrontation between himself and the victim. At that

-36-

confrontation, the Defendant shot and killed the victim. We believe that there was sufficient evidence developed during the State's case-in-chief for a rational juror to have found the elements of first-degree murder, including premeditation and deliberation, in spite of the Defendant's intimation of self-defense and defense of a third person theories. Accordingly, the trial court did not err in denying the Defendant's motion for judgment of acquittal.

The Defendant renewed his motion for judgment of acquittal at the close of all proof. By that time, the Defendant had presented witnesses in his own behalf to develop fully his theories of self-defense and defense of another. His proof focused on the relationship between himself and the victim and on the victim's manner of approaching his van at the scene of the shooting. As he developed his theories with his own witnesses, however, the prosecutor was able to assail the credibility of the theories through cross-examination. The cross-examination questioned the volume of harassing telephone calls and vulgar signs as well as whether the Defendant's reaction was one of anger or one of fear. It also questioned the Defendant's characterizations of the early relationship as one of magnanimous generosity on his part. In short, the prosecutor's cross-examination of the Defendant's witnesses was quite thorough and vigorously challenged the credibility of the Defendant's proof.

Affording the State the strongest legitimate view of the evidence and taking into account the challenge to the Defendant's credibility, we conclude that there was sufficient evidence supporting a first-degree murder charge to survive the Defendant's renewed motion for judgment of acquittal at the close of all proof. Although the Defendant had presented his fully-developed theories of self-

defense and defense of another by the time of the close of all proof, the State had effectively questioned the credibility of the theories as they had been presented. We believe that there remained sufficient evidence for a rational juror to have found the elements of first-degree murder, including premeditation and deliberation, in spite of the Defendant's proof in support of his self-defense and defense of a third person theories. Accordingly, the trial court did not err in denying the Defendant's renewed motion for judgment of acquittal.

The Defendant also contends that the evidence is legally insufficient to support either his conviction for second-degree murder or a conviction for voluntary manslaughter. For the reasons outlined in our discussion of the Defendant's challenge to the denial of his Rule 29 motion for judgment of acquittal, we believe that the evidence was also legally sufficient to support his conviction for second-degree murder. Having resolved that there was sufficient evidence to support his conviction, we need not address the Defendant's additional argument that there was insufficient evidence to support a conviction for voluntary manslaughter in the event that there was insufficient evidence to support his second-degree murder conviction. We conclude that all three of the Defendant's contentions in the first issue on appeal lack merit.

### III.  SELF-DEFENSE JURY INSTRUCTION

In the second issue, the Defendant contends that the trial court's jury instruction on self-defense was erroneous and that the prosecutor's closing argument compounded that error.  The Defendant argues that the erroneous instruction misled the jury into believing that a use of physical force by the victim was required to support a claim of self-defense.

The proof adduced at trial obviously raised an issue of self-defense.  The Defendant submitted a special jury instruction request on that issue.  The Defendant's special request differed slightly from the pattern jury instruction on self-defense.  After hearing argument, the trial court denied the Defendant's special request on self-defense, choosing instead to give the pattern jury instruction.[6]

The portion of the instruction which the Defendant challenges occurred at the very beginning of the entire instruction.  The trial court's instruction on self-defense began as follows:

> Included in the defendant's plea of not guilty is his plea of self-defense.
> When a person is assaulted <u>by the use of force</u> in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of death or serious bodily injury, he will be justified in using force to defend himself even to the extent of killing another human being.

(emphasis added).  The self-defense jury instruction is quite long and continues for two more pages in the record.  The instruction given by the trial court mirrors

---

[6] Whether intentionally or not, the trial court did incorporate some of the Defendant's proposed changes.  These changes were discussed during argument and were not objected to by the State.  The incorporated changes are minor and are not pertinent to the error alleged on appeal.

the pattern jury instruction in all ways except for the emphasized phrase above and minor changes suggested by the Defendant.

The Defendant contends that the emphasized language is erroneous in that it omits a relevant phrase suggested by the options under the pattern jury instruction itself. The opening sentence of the pattern jury instruction reads:

> When a person is assaulted, by the [use of force] [attempted use of force], in such a way as to create in his mind a reasonable belief that he is in imminent and actual danger of [death] [serious bodily injury], he will be justified in [threatening] [using] force to defend himself even to the extent of killing another human being.

T.P.I. -- Crim. 40.06 (3d ed.) (emphasis added). The Defendant argues that the evidence presented at trial was such that both "use of force" and "attempted use of force" were required.

The trial court's omission of "attempted use of force" from the opening sentence of the instruction is somewhat curious. During a Rule 30 hearing[7] prior to instructing the jury, the trial court, the prosecutor and the Defendant all agreed that the proof presented at trial supported the inclusion of both the "use of force" and the "attempted use of force" language. In considering the contention, the Defendant suggested that the trial court also define "assault" for the jury in order to clarify further that physical force or contact by the victim is not a prerequisite to a valid self-defense claim.[8] The trial court declined to define "assault." After the trial court had read the charge to the jury, the Defendant renewed his special requests and indicated to the trial court that the self-defense instruction was

_____

[7] Tenn. R. Crim. P. 30.

[8] The provisions governing self-defense are set forth at Tennessee Code Annotated section 39-11-611. As the statute makes clear, a physical attack by the victim is not a requirement to support a self-defense claim.

-40-

misleading with regard to physical force, particularly in light of the content of the prosecutor's closing argument. The Defendant again requested that the trial court define "assault" to ensure that the jury understood that physical force or contact by the victim was not required. The trial court again declined, stating that "assault" is a term which "needs no further description."

The initial omission of "attempted use of force" is even more curious given that both phrases are used together later in the instruction. As we stated above, the self-defense instruction is rather lengthy. The "attempted use of force" language is omitted from the initial sentence of the instruction. Later in the opening paragraph, however, the trial court used both options as follows: "The use of force can only be to the degree reasonably believed to be immediately necessary to protect against the other's use or attempted use of unlawful force." (Emphasis added). In addition, several paragraphs later in the instruction, the trial court used the following language:

> The threat or use of force against another is not justified if the defendant provoked the deceased's use or attempted use of unlawful force, unless the defendant abandoned the encounter or clearly communicated to the deceased the intent to do so, and the deceased nevertheless continued or attempted to use unlawful force against the defendant.

(Emphasis added). Thus, it appears that the only significant difference between the pattern instruction and the instruction actually given to the jury is the omission of the "attempted use of force" language from the opening sentence of the instruction.

It is well-established in Tennessee that the trial court has the duty of giving a correct and complete charge of the law applicable to the facts of the case and

the defendant has the right to have every issue of fact raised by the evidence and material to the defense submitted to the jury upon proper instructions by the trial court. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), cert. denied, 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); State v. Bryant, 654 S.W.2d 389, 390 (Tenn. 1983); State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975) (citing Poe v. State, 212 Tenn. 413, 370 S.W.2d 488 (1963)). In evaluating a jury charge, particular instructions must not be considered in isolation, but rather in the context of the overall charge. State v. Bolin, 678 S.W.2d 40, 43 (Tenn. 1984) (citing Cupp v. Naughten, 414 U.S. 141, 146-47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). Thus, the charge must be viewed in its entirety or considered as a whole. Otis v. Cambridge Mutual Fire Insurance Co., 850 S.W.2d 439, 446 (Tenn. 1992).

Citing these principles, the State argues that the omitted language in the present case was slight and, considered within the context of the entire charge, did not render the charge erroneous. The State points out that subsequent language in the instruction included both the "use of force" phrase and the "attempted use of force" phrase. The State contends that the remainder of the self-defense jury instruction adequately conveyed the essential concepts of the defense.

We recognize that subsequent language in the trial court's instruction included both relevant phrases and correctly conveyed concepts governing the issue of self-defense. Yet we cannot escape the conclusion that the trial court's instruction on self-defense was erroneous. It is clear that "inconsistent or contradictory instructions 'do not neutralize or validate each other, but are vitally

erroneous . . . . The parties are entitled to a clear and consistent charge, as well as a correct one, that justice may be reached.'" State v. Stephenson, 878 S.W.2d 530, 555 (Tenn. 1994) (quoting Citizens Street Railroad Co. v. Shepherd, 107 Tenn. 444, 64 S.W. 710, 711 (1901)). In Stephenson, our supreme court further explained the principle as follows:

> Instructions as a whole must be consistent and harmonious, not conflicting and contradictory . . . . Where instructions given to the jury for their guidance present contradictory and conflicting rules which are unexplained, and where following one would or might lead to a different result than would obtain by following the other, the instructions are inherently defective. This is true although one of the instructions correctly states the law applicable to the facts of the case, since the correct instruction cannot cure the error in the contradictory erroneous instruction . . . .

Id. (quoting Abbott v. American Honda Motor Co. Inc., 682 S.W.2d 206, 209 (Tenn. App. 1984)).

Applying those precepts to the charge in the case sub judice, it is clear that the trial court's self-defense instruction was inconsistent in parts and thereby potentially misleading. We believe, therefore, that the trial court's initial omission of the "attempted use of force" language, an option suggested by the pattern jury instruction itself, was erroneous. The omitted language was relevant and raised by the proof at trial. Accordingly, we conclude that the trial court's failure to include the "attempted use of force" language at the beginning of the instruction on self-defense was error.

The State argues that, even if the omission was error, it was at most harmless error. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a). The Defendant, on the other hand, argues that the erroneous instruction was not harmless, particularly in light of the prosecutor's closing argument regarding the

issue covered by the instruction.  The Defendant contends that the prosecutor's argument concerning self-defense and the "use of force" compounded the erroneous instruction and misled the jury into believing that a physical attack by the victim was necessary to sustain a self-defense claim.

To support his argument, the Defendant quoted extensively from the prosecutor's closing argument in his brief.  The relevant portions of that argument are as follows:

> MR. JOLLEY: And listen to what the judge's instruction on self-defense says.  It doesn't start with reasonable beliefs.  The first words of that charge to you after included . . . in the defendant's plea of not guilty is his plea of self-defense, <u>when a person is assaulted.  Is it walking back, whether normally or briskly with your hands, is that an assault?  Did Rodney Shepard assault anybody in that vehicle by going back toward that vehicle?</u>  Only-- only, ladies and gentleman, if you believe the testimony of John Joslin or Sandra Joslin, because nobody else has him closer than the front bumper of that car-- truck-- van until he is lying there on the pavement.  Nobody.  The only people who do are John Joslin and Sandra Joslin.  And you remember, we talked about that in opening, about the left hand through the window or the right arm grabbing.  We talked about that.
> And why is that necessary?  <u>Why does Sandra Joslin tell us for the first time about the grabbing?  Because you have to create the defense.  You have to get it within the terms of self-defense. . . . You have to have . . . an assault</u>, and there is none in this case.  There is none, because the testimony of John Joslin and Sandra Joslin as to that point is totally incredible.  It is unbelievable.  It is not supported by anything else in the record.
> Now, you go on, and the instruction . . . then says . . . <u>assaulted by the use of force-- by the use of force</u>.  What force did Rodney Shepard use?  He shut his car door.  He walked.  But he didn't use any force against anybody in that van.  He didn't do it.  Absolutely none.
> <u>Assaulted by the use of force</u>.  Again, unless you believe . . . John Joslin and Sandra Joslin. . . .
> By the use of force in such a way as to create in his mind a reasonable belief that he is in imminent and actual-- imminent and actual danger of death or serious bodily injury. ...
> And the Court will tell you what imminent means.  Imminent means near at hand, on the point of happening.  <u>The Court will tell you what force means.  Compulsion by the use of physical power or violence</u>.  It doesn't exist in this case.

> You know, whatever you want to say about the testimony of
> Michelle Flatt and Judy Allen and Phil Murphy about we thought
> there was going to be a fight, it doesn't exist.

(emphasis added). The Defendant objected several times to the prosecutor's argument. All of these objections were overruled by the trial court. In response to one of the Defendant's objections, the trial court stated, "Well, I'll instruct the jury as to the law. Overruled." In addition, the Defendant notes that at the conclusion of the self-defense jury instruction, the trial court defined "force" as meaning "compulsion by the use of physical power or violence." (emphasis added).

The Defendant certainly presents a compelling argument. As we pointed out above, however, the self-defense jury instruction is quite lengthy. Aside from the omission of the "attempted use of force" language from the initial sentence, the remainder of the instruction was complete and correct. More specifically, the self-defense instruction correctly focused the jury's inquiry on the Defendant's state of mind and the reasonableness of his beliefs. The instruction also allowed the jury to consider the history between the Defendant and the victim. Finally, the "use of force" language was accompanied by the "attempted use of force" language in subsequent phrases of the self-defense instruction.

After considering the entire instruction and the proof introduced at trial, we are confident that the trial court's erroneous jury instruction did not affect the result of the trial. See Tenn. R. Crim. P. 52(a). The trial court's error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Accordingly, this issue is without merit.

## IV.  CROSS-EXAMINATION OF THE DEFENDANT REGARDING PRETRIAL PREPARATION WITH HIS ATTORNEY

In the third issue, the Defendant challenges the actions of both the trial court and the prosecutor regarding cross-examination of the Defendant concerning his pretrial preparation with defense counsel.  These questions, in turn, led to additional cross-examination generally concerning the Defendant's prior criminal record.  He challenges this line of questioning as well.

During cross-examination, the prosecutor asked the Defendant how many times he had "sat in a witness stand and rehearsed" his testimony with defense counsel.  The Defendant seemed unsure as to the point of the prosecutor's question.  As a result, the prosecutor went on to recite details of the Defendant's pretrial preparation, such as other attorneys playing the roles of judge and district attorney, apparently in an effort to refresh the Defendant's memory.  Defense counsel objected to this line of questioning.  The trial court overruled the objection.  As part of his answer to the prosecutor's questions, the Defendant testified as follows:

> Q.     Mr. Joslin, when you practiced your testimony, you sat in a witness stand like you're sitting in today or similar, did you not?
> A.     Yes, sir.
> Q.     And you had a judge who was sitting next to you.  Do you know now that his name is Jonathan Cooper?
> A.     I didn't know his name.  And before, when you asked me if I had sat in a courtroom, I -- I didn't know what you meant.  I had not sat in a courtroom.  I went up -- I did go to a little room with just --
> Q.     A witness stand?
> A.     -- a small --
> Q.     Small courtroom --
> A.     -- tiny little place, and I was sitting at a witness stand, and someone was supposed to have been representing a judge, and someone was supposed to have been representing somebody else, and I was to get familiar with what type of procedures I'd been going through.  I've never been through nothing like that, and I guess it

was to keep me from being so nervous or something. I don't know why.

(emphasis added).

At this point, the prosecutor requested a bench conference. During this conference, the prosecutor alerted the trial court to his intention to ask the Defendant about misdemeanor convictions from 1973. Defense counsel objected, asserting that the convictions were too remote to be admissible and that the State had not complied with the provisions of Rules 608 or 609 of the Tennessee Rules of Evidence. In response, the prosecutor argued that the Defendant had made a sweeping claim of good conduct, thereby opening the door to impeachment without regard to strict compliance with Rule 608. The trial court eventually allowed limited questioning of the Defendant. The prosecutor, with the trial court's agreement, asked the Defendant if he had been through a bench trial in Knox County General Sessions Court before Judge Jewell Watson on April 6, 1973. The Defendant responded affirmatively. The prosecutor did not introduce copies of the Defendant's convictions.

Faced with this cross-examination, defense counsel took two courses of action. Once the trial court had decided to allow the questions regarding pretrial preparation, defense counsel requested that the trial court give a limiting instruction to the jury. The requested limiting instruction reads in pertinent part:

> It is quite natural and proper that a defendant will prepare his testimony with his attorney prior to the trial. No attorney would begin a trial without discussing questions that may be asked of his client during the case and preparing his client to testify. In the same way, the prosecutor typically prepares his witnesses for their testimony prior to trial. The fact that the attorneys have prepared their witnesses for trial is a proper function of trial counsel and is to be expected.

The trial court denied the requested limiting instruction. Defense counsel's second course of action was to request permission to call an expert witness to rebut the prosecutor's questioning of the Defendant regarding pretrial preparation. That witness, Thomas Dillard, had practiced criminal law extensively, both as a prosecutor and as a defense attorney. Dillard would have testified as follows:

> It is my opinion that it is common and expected practice for prosecuting attorneys and defense attorneys alike to prepare witnesses for testimony in courtroom proceedings. Witnesses are often unfamiliar with and extremely nervous about courtroom proceedings. These witnesses are often placed at ease by this process, and can more accurately communicate their testimony.
>
> As a prosecutor, I have often taken witnesses into an empty courtroom in advance of their testimony, and placed them on the witness stand to go through their direct examination. I often had these witnesses undergo a mock cross examination, either with another attorney or me as the cross-examiner. I have often followed the same procedure as a defense attorney.
>
> In my opinion, preparation of witnesses in this manner is often necessary and common practice, and should be expected of thorough and competent counsel.

The trial court did not permit Dillard to testify at trial.

On appeal, the Defendant first argues that the questions concerning his pretrial preparation were irrelevant and violated his Sixth Amendment right to counsel. Of course, evidence which is not relevant is not admissible. Tenn. R. Evid. 402. We believe, however, that the questions concerning the Defendant's pretrial preparation were of some relevance. The prosecutor sought to challenge the credibility of the Defendant's testimony on direct examination by questioning him if he had rehearsed his testimony "line by line." It appears that none of the questions implicated any material protected by the attorney-client privilege.[9] In

---

[9] The preparation to which the prosecutor's questioning refers was apparently conducted in the presence of individuals other than the Defendant's attorneys. As such, the preparation was not protected by the attorney-client privilege. See, e.g., Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct.

our opinion, the prosecutor's inquiry did have some relevance. We point out that defense counsel had no objection to the prosecutor's asking the Defendant if he had "gone over his testimony" with his attorneys. In fact, defense counsel specifically questioned the State's witness Judy Allen about whether she had met with the prosecutor in preparation for her testimony at trial. Accordingly, we find no error with the trial court's decision that such questions were relevant as a challenge to the credibility of the Defendant. See Tenn. R. Evid. 401. Furthermore, we cannot conclude that the prejudicial effect of the questions substantially outweighed their probative value. See Tenn. R. Evid. 403.

The Defendant also contends that the prosecutor's questions concerning pretrial preparation violated his Sixth Amendment right to counsel. A prosecutor violates the defendant's right to counsel when, through examination of a witness or argument to the jury, he or she seeks to penalize the defendant for exercising this constitutional right. State v. Hines, 919 S.W.2d 573, 580 (Tenn. 1995), cert. denied, 117 S.Ct. 133, 136 L.Ed.2d 82 (1996) (citation omitted). In the case sub judice, the prosecutor's cross-examination sought to challenge the credibility of the Defendant by suggesting that his persuasive testimony on direct examination could have been bolstered by "line by line" preparation prior to trial. We do not believe that the prosecutor's questions rose to the level of penalizing the Defendant for exercising his right to counsel. In our view, the prosecutor's questioning was not intended to attack the Defendant's use of an attorney but rather to question the reliability and persuasiveness of his compelling testimony which could have been aided by "line by line" preparation. As a result, we

_____

837, 51 L.Ed.2d 30 (1977); Sims v. Banks of Commerce & Trust Co., 14 Tenn. App. 672 (1932).

conclude that the questions posed by the prosecutor regarding pretrial preparation did not violate the Defendant's right to counsel.

The Defendant next argues that, if the questions concerning pretrial preparation were proper, it was error for the trial court both to refuse to give the limiting instruction and to exclude the expert testimony of Thomas Dillard. Rulings on the admissibility of evidence and the propriety and form of cross-examination are entrusted to the sound discretion of the trial court. See, e.g., State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994), cert. denied, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995); State v. Harris, 839 S.W.2d 54, 72 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Such rulings will not be reversed on appeal absent an abuse of that discretion. See State v. Caughron, 855 S.W.2d 526, 541 (Tenn. 1993), cert. denied, 510 U.S. 579, 114 S.Ct. 475, 126 L.Ed.2d 426 (1993).

In the case at bar, we conclude that by denying both the limiting instruction and the expert testimony, the trial judge abused his discretion. Given the nature of the cross-examination of the Defendant, we believe that the proffered testimony of Thomas Dillard was relevant. We see no basis for not allowing the testimony and, in fact, the trial judge offered no reason when he excluded the testimony. In our view, the limiting instruction would have accomplished the same objectives as Dillard's testimony. Had the trial court chosen to give the limiting instruction but denied Dillard's testimony, we would not find an abuse of discretion under the facts as they developed in this case. To deny both the limiting instruction and the testimony without explaining a rationale for the decision, however, was an abuse of the trial judge's discretion.

Although we believe the trial court's actions constituted an abuse of discretion, we nevertheless conclude that the error was harmless beyond a reasonable doubt. The prosecutor's questions concerning pretrial preparation appeared to be intended to challenge the credibility and persuasiveness of the Defendant's compelling testimony on direct examination. This challenge to the Defendant's credibility, however, paled in comparison to the prosecutor's vigorous cross-examination regarding details of the history between the Defendant and the victim as well as the events which occurred on the day of the shooting. On cross-examination, the prosecutor was able to portray the history between the Defendant and the victim in a different light from that presented on direct examination, effectively suggesting that the Defendant had taken advantage of the victim monetarily. Furthermore, the prosecutor was able to examine and to emphasize certain actions of the Defendant on the day of the shooting from a more critical perspective.[10] Given the rigorous cross-examination of the Defendant on other matters, we are confident that the trial court's error with regard to the questions concerning pretrial preparation did not affect the result of the trial. See Tenn. R. Crim. P. 52(a).

As we detailed above, the prosecutor's questions concerning pretrial preparation led to questions based on the Defendant's prior criminal record. The Defendant also challenges the latter questions on appeal, contending that the assistant district attorney general's actions in seeking to ask questions based on

_____

[10] Some of the actions focused on by the prosecutor were the Defendant's placement of the pistol in the eave of his carport after the shooting, his vague answers to initial police questions upon his approach to the neighbor's home, and the fact that he happened to be carrying the revolver on February 26, 1994 when he had not taken the gun outside of his home for years.

-51-

his prior criminal record constituted prosecutorial misconduct and that the trial court's decision to allow such questions was error.

At trial, the Defendant argued that his prior convictions were too remote to be the basis for any questions on cross-examination and that the State had failed to comply with the notice provisions of either Rule 608 or Rule 609 of the Tennessee Rules of Evidence. The prosecutor then narrowed his inquiry for the trial court, stating that he intended to ask the Defendant only if he had been through a bench trial in 1973. In response to the Defendant's argument in favor of exclusion, the prosecutor asserted that the Defendant had made a sweeping claim of good conduct by stating "I've never been through nothing like that," thereby opening the door to questions about specific instances of conduct without strict compliance with Rule 608. The trial court allowed the prosecutor's limited questions.

After examining the record, we believe that the prosecutor's cross-examination stemming from the Defendant's prior convictions was improper and that the trial court erred in admitting the testimony. We will first address the trial court's ruling in this matter. Initially, we note that the prosecutor did not attempt to introduce copies of the Defendant's convictions pursuant to Rule 609. Nor were the prosecutor's questions aimed at eliciting details of the criminal behavior that was the basis for those convictions. Instead, the prosecutor sought to impeach the Defendant's statement that he "had never been through nothing like [testifying at trial]" by questioning him about whether he had experienced a trial procedure in 1973. As such, the prosecutor stated that he was inquiring into a specific instance of conduct pursuant to Rule 608.

It is clear from the record that the State did not provide notice to the Defendant regarding its intended use of the prior convictions in accordance with either Rule 608 or Rule 609. Both rules provide that if the prosecution seeks to impeach the accused in a criminal prosecution, the State must give the accused reasonable written notice before trial. Tenn. R. Evid. 608(b)(3), 609(a)(3). In fact, at one point during argument from counsel concerning the prosecutor's proposed questions, the trial court specifically noted that the State had not provided notice to the Defendant.

In addition, the Defendant's convictions and the conduct inquired into by the prosecutor occurred twenty-one years prior to his indictment for the present case. As a general rule, conduct which occurred more than ten years before the commencement of the prosecution is not admissible. Tenn. R. Evid. 608(b)(2). Such conduct is commonly excluded because it is viewed as too stale to be probative. See generally Neil P. Cohen et al., Tennessee Law of Evidence § 608.7 (3d ed. 1995). Stale instances of conduct may nevertheless be admissible if the proponent of such evidence gives the adverse party sufficient advance notice to allow a fair opportunity to contest the use of the evidence and the trial court determines that the probative value of the evidence substantially outweighs its prejudicial effect. Tenn. R. Evid. 608(b)(2).

In the case at bar, the trial court did not make a finding that the probative value of the evidence substantially outweighed its prejudicial effect. In fact, it appears that the trial court ignored most of the procedure established for

determining the admissibility of specific instances of conduct.[11]  The trial judge merely stated that he would allow the limited questions proposed by the prosecutor during the jury-out hearing.  We point out that the balancing test applicable in this situation ordinarily results in the exclusion of evidence.  See Cohen, Tennessee Law of Evidence § 608.7.  In our view, the probative value of the evidence as a challenge to the Defendant's credibility is slight.  The prejudicial effect of the evidence, however, is substantial, risking conveying to the jury that the Defendant has a prior criminal record even though his stale misdemeanor convictions were inadmissible.  From our review of the record, we believe that the probative value of the evidence did not substantially outweigh its prejudicial effect.

Furthermore, we find no merit in the prosecutor's argument that the Defendant made a sweeping claim of good conduct which allowed inquiry into specific instances of conduct without strict compliance with Rule 608.  We agree that if a witness makes a sweeping claim of good conduct on direct examination, that claim may open the door to cross-examination without pretrial notice and with a lower standard of probativeness.  See Advisory Commission Comments to Tenn. R. Evid. 608(b); see also State v. Johnson, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984); cf. State v. Miller, 674 S.W.2d 279, 284 (Tenn. 1984) (evidence of mere arrests or indictments is generally inadmissible unless the accused

---

[11] Rule 608(b) sets forth the procedure to be followed by a trial court in determining the admissibility of specific instances of conduct for impeachment purposes.  The trial court did conduct a jury-out hearing at the request of the Defendant and did note the lack of notice.  The trial court did not, however, make a finding that the specific instance of conduct had probative value or that a reasonable factual basis existed for the inquiry.  Tenn. R. Evid. 608(b)(1).  Moreover, the trial court did not make any findings regarding the balance between probative value and prejudicial effect.  Tenn. R. Evid. 608(b)(2).

somehow opens the door for impeachment, such as by testifying that he or she had never been arrested).

We do not view the Defendant's statement that he "had never been through nothing like that" as a sweeping claim of good conduct. The prosecutor asked the Defendant a question about his pretrial preparation. The clear implication of the Defendant's entire answer to the prosecutor's question was that his attorneys prepared him prior to trial because he had not experienced the situation of testifying in a hotly-contested murder trial. The Defendant was attempting to explain the reasons for his pretrial preparation. We do not believe that the Defendant's statement rose to the level of a sweeping claim of good conduct which would allow impeachment with no pretrial notice and a lower standard of probativeness. As a result, the specific instance of conduct inquired into by the prosecutor did not meet the admissibility requirements of Rule 608. We therefore conclude that the trial court erred in allowing the prosecutor's inquiry.

We turn now to the propriety of the prosecutor's conduct in seeking to ask the Defendant questions arising from his prior convictions. The prosecutor revealed that his knowledge of the Defendant's prior convictions came from Tennessee Department of Safety memoranda. The first memorandum, written on April 25, 1973, indicates that the Defendant was "tried in General Sessions Court with the Hon. Judge Jewell Watson presiding and at the conclusion of the trial . . . the Judge took the case under advisement. At this time, the Judge has not handed down a decision due to the defense filing a motion that this charge be quashed as the officers who entered the Big T Truck Stop on this occasion

had signed a paper that they were not officers and therefore entered under a disguise." A second memorandum was written on May 30, 1973. It indicated that the trial judge had found the Defendant guilty as charged of running a house of prostitution and had sentenced him to a fifty dollar ($50) fine and a six-month suspended sentence.

Because of the lack of pretrial notice, defense counsel was unaware of the circumstances of either the offenses or the trial. During argument to the trial court, defense counsel stated that he did not know if the Defendant had even testified at the 1973 trial. Defense counsel requested that the trial court ask the Defendant if he had testified in 1973. He argued that if the Defendant had not testified in 1973, and thus had not been through anything like testifying at trial before the present case, then the prosecutor's proposed questions had no probative value. The trial court declined defense counsel's request and allowed the prosecutor to question the Defendant about the 1973 trial. The Defendant was later able to procure certified copies of his 1973 convictions. Those copies indicate that the Defendant pleaded guilty to the offenses which comprise his 1973 misdemeanor convictions.

This series of events clearly reveals the dangers associated with relying on law enforcement memoranda rather than official court documents. The prosecutor, relying on the Tennessee Department of Safety memoranda, apparently believed that the Defendant had undergone a bench trial in 1973 which resulted in criminal convictions. Certified copies of the convictions indicate that the Defendant did not have a trial but rather pleaded guilty to the offenses.

In addressing a similar type of law enforcement conviction information, our supreme court stated that N.C.I.C. "rap" sheets "are not admissible as a substitute for certified copies of court convictions nor for any other purpose." State v. Buck, 670 S.W.2d 600, 607 (Tenn. 1984). The court noted that such reports are pure hearsay and of dubious accuracy. Id. Likewise, a panel of this Court admonished a prosecutor for using such reports for impeachment purposes. State v. Philpott, 882 S.W.2d 394, 403-04 (Tenn. Crim. App. 1994). Interestingly enough, the prosecutor admonished in Philpott is the same prosecutor who conducted this case.[12] We view the information contained in the Tennessee Department of Safety memoranda as similar to the information from N.C.I.C. reports condemned in prior cases. To impeach the Defendant with questions arising from these remote and stale prior convictions based solely on information garnered from Tennessee Department of Safety memoranda rather than examining copies of the actual convictions was, we believe, improper. Cf. Philpott, 882 S.W.2d at 403-04.

Having concluded both that the prosecutor's conduct was improper and that the trial court erred in admitting the testimony, we must now examine the effect of these errors on the Defendant's trial. We note once again that the Defendant's convictions were not introduced at trial nor were they even mentioned directly. The prosecutor's questions about whether the Defendant had experienced a trial procedure in 1973 were obviously an attempt to challenge the Defendant's credibility. This challenge constituted only two questions out of nearly one hundred pages of cross-examination. As we stated above, the prosecutor's cross-examination regarding details of the history between the

---

[12] We point out that Philpott was filed a full year before the trial in the case at bar.

Defendant and the victim as well as the events which occurred on the day of the shooting was quite vigorous. The challenge to the Defendant's credibility posed by the two questions concerning a 1973 trial procedure paled in comparison to the remainder of the prosecutor's cross-examination of the Defendant. Accordingly, we believe that the errors with regard to the questions concerning the 1973 trial procedure did not affect the result of the trial. See Tenn. R. Crim. P. 52(a). The third issue is therefore without merit.

## V. TRIAL COURT'S EVIDENTIARY RULINGS

In his fourth issue, the Defendant argues that trial court made numerous erroneous evidentiary rulings which deprived him of his right to present an effective defense. See U.S. Const. amend. VI, XIV, § 1. The Defendant makes clear that he is not arguing that he was prevented from presenting a defense altogether. Rather, he contends that the trial court's evidentiary rulings restricted his proof in such a way as to deprive him of "a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690-91, 106 S.Ct. 2142, 2146-47, 90 L.Ed.2d 636 (1986) (quoting California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984)).

### A. Trial Court's Interference with Impeachment of Adverse Witnesses

The Defendant contends that the trial court interfered with his impeachment of several State's witnesses. He first alleges that the trial court improperly restricted his cross-examination of Michelle Flatt and Phillip Murphy concerning prior inconsistent statements. Both Flatt and Murphy had given

statements prior to trial which were somewhat inconsistent with portions of their testimony on direct examination. From our reading of the record, however, defense counsel thoroughly cross-examined both Flatt and Murphy regarding their prior inconsistent statements. In fact, defense counsel was even permitted to play an audiotape of Murphy's prior inconsistent statement. This allegation clearly lacks merit.

The Defendant next alleges that the trial court improperly restricted his cross-examination of Detective Mike Lett. Defense counsel sought to question Lett about the lack of a detailed police investigation into the history between the Defendant and the victim. He apparently hoped to develop proof of a bias against the Defendant in the police investigation of the shooting. The trial court restricted this line of inquiry, finding it irrelevant. See Tenn. R. Evid. 401, 402. We agree with the trial court that, under the circumstances of this case, questions concerning a bias against the Defendant during the police investigation are of marginal relevance. Moreover, the Defendant was permitted to put on extensive proof concerning the history between himself and the victim. This allegation has no merit.

The Defendant also challenges the prosecutor's manner of objecting during defense counsel's cross-examination of State's witnesses. The Defendant alleges that the prosecutor interjected fruitless objections in an effort to interrupt the cross-examination of State's witnesses and render it disjointed. We agree that the confrontation clauses of the state and federal constitutions guarantee a defendant an opportunity for effective cross-examination. See State v. Howell, 868 S.W.2d 238, 252 (Tenn. 1993), cert. denied, 510 U.S. 1215, 114 S.Ct. 1339,

127 L.Ed.2d 687 (1994) (citing Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15, 19 (1985)). After reviewing the record in the case at bar, however, we can only conclude that the Defendant's cross-examination of State's witnesses was thorough and well-done. Furthermore, we discern no indication that the prosecutor interjected fruitless objections in hopes of minimizing the impact of the Defendant's cross-examination. This allegation lacks merit as well.

The Defendant's final challenge in this regard concerns the trial court's restriction of his cross-examination of Judy Allen. Allen was the last witness to testify on June 27, 1995. Defense counsel cross-examined Allen regarding slightly inconsistent statements given during a deposition for the related civil case. Defense counsel had misplaced his copy of that deposition, however, and used an unmarked copy during his cross-examination. Allen was then examined by the prosecutor on redirect and, with the conclusion of her testimony, court stood in recess for the night.

On the morning of June 28, 1995, the first witness to be called was Allen's daughter, Michelle Flatt. Just before Flatt was called, defense counsel requested that Judy Allen be recalled. Defense counsel explained that he had located his copy of the deposition and wished to ask her a question about another inconsistency between the deposition and her testimony on direct examination. The inconsistency concerned which hand the victim had in his pocket as he approached the Defendant's van. On direct examination, Allen testified that the victim's left hand was in his pocket. During the deposition, Allen stated that she

could not remember which hand the victim had in his pocket.  The trial court denied the Defendant's request to recall Allen.

Faced with this ruling, the Defendant offered an alternative to the trial court.  The Defendant suggested that they admit into evidence the portion of Allen's deposition in which she stated that she was unsure as to which hand the victim had in his pocket.  The Defendant argued that, as a prior inconsistent statement offered for impeachment purposes, Allen's statement was not hearsay.  The trial court denied the Defendant's alternative request.

The decision of whether to permit a witness to be recalled is entrusted to the sound discretion of the trial court and will not be reversed on appeal absent abuse.  See Caughron, 855 S.W.2d at 539; State v. Hartman, 703 S.W.2d 106, 116 (Tenn. 1985), cert. denied, 478 U.S. 1010, 106 S.Ct. 3308, 92 L.Ed.2d 721 (1986); State v. Johnson, 685 S.W.2d 301, 306 (Tenn. Crim. App. 1984) (citing Lillard v. State, 528 S.W.2d 207 (Tenn. Crim. App. 1975)).  In our view, the trial court's refusal to allow Judy Allen to be recalled or to allow the inconsistent portion of her deposition to be introduced into evidence constituted an abuse of discretion.  We see no good or valid reason for the denial of both alternatives presented to the trial court.  The record indicates that Judy Allen resided in Knox County at the time of the trial.  She testified in court on the day before the recall request.  Her daughter testified on the day of the recall request.  It certainly appears that Allen would have been available for recall.  In the wake of the trial court's recall ruling, the Defendant presented a reasonable, limited alternative.  We believe that the trial court erred in denying both the recall request and the Defendant's proposed alternative.

We do not, however, believe that this error affected the result of the trial. The Defendant attempted to recall Judy Allen in an effort to impeach her with a prior inconsistent statement, thereby assailing her credibility. Defense counsel had already effectively questioned Allen's credibility through the remainder of cross-examination. We are satisfied that any error in this regard was harmless. See Tenn. R. Crim. P. 52(a).

## B. Trial Court's Exclusion of the Defendant's Out-of-Court Statements Concerning his Relationship with the Victim

The Defendant contends that the trial court erroneously excluded evidence of his out-of-court statements concerning his relationship with the victim. After his own testimony, the Defendant presented several witnesses who testified concerning his state of mind with regard to the victim. On direct examination, defense counsel sought to question these witnesses, principally family members of the Defendant, about what the Defendant had told them concerning the threatening and harassing actions taken by the victim. Upon the prosecutor's objections, the trial court did not permit the witnesses to recount what the Defendant had told them about his relationship with the victim. Instead, the trial court limited their testimony to their observations of the Defendant's state of mind and the Defendant's statements to them actually expressing his state of mind. See Tenn. R. Evid. 803(3).

The Defendant offered the trial court two separate arguments in favor of the admission of testimony from defense witnesses about the Defendant's statements to them regarding the threatening and harassing conduct of the victim. The trial court found both arguments unpersuasive. The Defendant now

raises both arguments on appeal. He first argues that such testimony was admissible as a nonhearsay declaration to prove circumstantially his state of mind. The Defendant asserts that the testimony from defense witnesses about what he had told them concerning the victim's conduct was not offered to prove the truth of the matter asserted, namely that the victim had engaged in threatening or harassing conduct. Instead, the testimony was offered to demonstrate circumstantially the Defendant's fear of the victim.

We believe that the Defendant has made a sound argument. Given that the testimony from defense witnesses about the Defendant's statements concerning the threatening and harassing conduct was not offered to prove the truth of the matter asserted, it was not hearsay. Tenn. R. Evid. 801(c). Such nonhearsay declarations have been deemed admissible where, as here, they were offered to prove circumstantially the declarant's state of mind. See Caughron, 855 S.W.2d at 537; State v. Cravens, 764 S.W.2d 754, 755 (Tenn. 1989); see generally Neil P. Cohen et al., Tennessee Law of Evidence § 801.7 (3d ed. 1995). As a result, we conclude that the trial court erred in excluding such testimony.

We believe, however, that the trial court's error was harmless beyond a reasonable doubt. The Defendant testified fully about his relationship with the victim and the victim's threatening and harassing conduct. He also testified fully about his fearful state of mind with regard to the victim. Moreover, the defense witnesses from whom the above testimony was sought were permitted to testify about their observations of the Defendant's mental state. These witnesses all confirmed that the Defendant was fearful of the victim. Accordingly, we believe

that the Defendant was permitted to introduce ample evidence of his state of mind with regard to the victim. Any additional testimony about nonhearsay declarations of the Defendant offered to prove circumstantially his state of mind would have been largely superfluous. We can only conclude that the exclusion of this testimony did not affect the result of the trial. See Tenn. R. Crim. P. 52(a).

The Defendant's second argument in favor of admission of the testimony characterizes the Defendant's statements to defense witnesses about the victim's threatening conduct as prior consistent statements offered to rebut the State's claim of recent fabrication. We agree that prior consistent statements may be admissible to rehabilitate a witness when insinuations of recent fabrication have been made or when deliberate falsehood has been implied. See State v. Jones, 215 Tenn. 206, 217-19, 385 S.W.2d 80, 85 (1964); State v. Benton, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988). Such statements do not qualify as hearsay because they are offered solely to rehabilitate the credibility of a witness rather than for the truth of the matters asserted in the statements. See Tenn. R. Evid. 801(c); see generally Cohen, Tennessee Law of Evidence § 801.8; David Louis Raybin, Tennessee Criminal Practice and Procedure § 27.234. Before prior consistent statements become admissible in this regard, however, the testimony of the witness must have been assailed or seriously questioned to the extent that his or her credibility needs rehabilitation. Benton, 759 S.W.2d at 433-34.

In the case sub judice, the prosecutor's cross-examination of the Defendant was vigorous and challenged his credibility. In fact, the prosecutor's principal strategy for attacking the Defendant's proof was to suggest that the Defendant was "creating a defense." In view of the attack on the Defendant's

credibility, we believe that testimony from defense witnesses demonstrating that the Defendant had related the same incidents of threatening and harassing conduct on behalf of the victim well before the shooting was admissible to rebut the prosecutor's insinuation of recent fabrication or deliberate falsehood.

The error in excluding this testimony, however, was harmless beyond a reasonable doubt. Although the prosecutor assailed the Defendant's credibility on cross-examination, the principal challenge to his credibility involved his reaction to the conduct of the victim rather than whether the conduct of the victim had actually occurred. The Defendant testified on direct examination that the victim's conduct made him fearful of the victim. The prosecutor's cross-examination suggested that the Defendant reacted to the victim's conduct with anger and that the Defendant's testimony that he was fearful was not credible. As we stated above, the defense witnesses whose testimony was limited by the trial court's ruling were permitted to testify about their observations of the Defendant's mental state, and they all confirmed that the Defendant was fearful of the victim. Any further testimony on the part of those witnesses concerning what the Defendant had told them with regard to the victim's conduct would have been only marginally relevant and merely superfluous to the issue of the credibility of the Defendant's testimony about his fearful state of mind in reaction to the victim's conduct. Accordingly, we conclude that the trial court's error in this regard did not affect the result of the trial. See Tenn. R. Crim. P. 52(a).

## C. Trial Court's Exclusion of Evidence of the Victim's Threatening, Violent Conduct Against Other Individuals

The Defendant next contends that the trial court erroneously excluded evidence of the victim's violent and threatening conduct toward other individuals. Defense counsel sought to question several witnesses about their observation of violent or threatening conduct committed by the victim against other individuals. For instance, it appears from the proffer of defense witness Robert Ferguson that he became involved in a dispute with Rodney Shepard and his brother, Jimmy Shepard, over the completion of plumbing work at a bar owned by Ferguson. Shortly thereafter, Ferguson began to receive threatening telephone calls from the victim. In addition, according to the proffer of David Riley, Rodney Shepard committed several threatening acts and made threatening telephone calls to him after a dispute arose over Riley's refusal to allow Shepard to place his trailer on property owned by Riley. The Defendant also offered a proffer from Judy Branstetter, who lived across the street from Rodney Shepard on Dante Road. According to Branstetter's proffer, a dispute arose between her brother-in-law and Rodney Shepard. During a telephone conversation with Rodney Shepard's wife, Branstetter overheard Shepard shouting in the background to tell Branstetter's brother-in-law to "meet me out in the middle of the street, and I will take care of it."

The trial court excluded all such testimony, ruling that evidence of specific violent acts of the victim against third persons which were unknown to the Defendant at the time of the shooting could only be inquired into on cross-examination of the victim. The trial judge based his ruling on his interpretation of Tennessee Rule of Evidence 405(a), State v. Hill, 885 S.W.2d 357 (Tenn.

Crim. App. 1994), and State v. Ray, 880 S.W.2d 700 (Tenn. Crim. App. 1993).

Defense counsel pointed out that, given that this case involved a homicide, he

could not cross-examine the victim, asking the trial court "who are we supposed

to cross-examine about this?" The trial court stated simply, "Well, I don't know."

On appeal, as at trial, the Defendant asserts that he was not offering

evidence of the victim's violent conduct against other individuals as substantive

proof of the victim's character or to prove that the victim acted in accordance with

a character trait. Instead, the Defendant maintains that he was offering such

evidence to corroborate his self-defense claim that the victim was the first

aggressor. The Defendant contends that evidence of the victim's violent conduct

toward others, even if unknown to the Defendant at the time of the shooting, was

admissible for that limited purpose.

In cases involving a self-defense issue, we believe that Tennessee law

does permit the introduction of evidence of a victim's violent conduct toward third

persons, even if the defendant is unaware of that conduct, under certain

circumstances. See State v. Ruane, 912 S.W.2d 766, 779-82 (Tenn. Crim. App.

1995). The admissibility of such evidence depends upon the purpose for which

it is offered. The treatment of proof offered as substantive evidence is different

from that of proof offered for corroborative purposes only.

The treatment of proof of the victim's violent character offered as

substantive evidence is governed generally by Tennessee Rules of Evidence

404(a)(2) and 405. Under these rules, evidence of the victim's violent character

is admissible but is limited to opinion testimony or testimony about the victim's

reputation in the community.  Tenn. R. Evid. 405(a); see also State v. Barnes, 675 S.W.2d 195, 197 (Tenn. Crim. App. 1984).  Thus, the defendant or other witnesses may testify on direct or cross-examination about their opinion of the victim's violent character or the victim's reputation for violence in the community. Tenn. R. Evid. 405(a).  Of course, violent acts committed by the victim against individuals other than the defendant may contribute to the victim's reputation for violence.  This type of testimony constitutes substantive evidence of the victim's character trait for violence.  See Tenn. R. Evid. 404(a)(2).

The principles governing the admissibility of specific violent acts of the victim against third persons are somewhat more stringent than those governing the admissibility of opinion or reputation evidence.  If the defendant was aware of the victim's violent conduct against other individuals at the time of the offense, such proof is admissible as substantive evidence of the defendant's state of mind.  See Ruane, 912 S.W.2d at 779 (citing State v. Hill, 885 S.W.2d 357, 361 (Tenn. Crim. App. 1994)).  Because such evidence is offered to establish the defendant's state of mind with respect to the victim, the defendant's knowledge of the specific violent acts of the victim against others is required.  See Williams v. State, 565 S.W.2d 503 (Tenn. 1978).  Thus, the defendant may testify about the victim's threatening or violent conduct toward other individuals as long as the defendant was aware of that conduct at the time of the offense.

If, on the other hand, the defendant was unaware of the victim's violent conduct toward others, the evidence obviously has no bearing on the defendant's state of mind and is not admissible as substantive proof on that issue.  See State v. West, 825 S.W.2d 695, 697 (Tenn. Crim. App. 1992).  Such evidence is

admissible, however, for the limited purpose of corroborating a self-defense claim that the victim was the first aggressor. Ruane, 912 S.W.2d at 781. We emphasize that this evidence is corroborative in nature rather than substantive. As such, it is not governed by Tennessee Rules of Evidence 404(a)(2) or 405. See Neil P. Cohen et al., Tennessee Law of Evidence § 404.4 (Supp. 1996). Thus, individuals other than the defendant may testify on direct or cross-examination about threatening or violent conduct of the victim, even though the defendant had no knowledge of that conduct at the time of the offense, as long as the testimony is offered only to corroborate the defendant's self-defense claim that the victim was the first aggressor. Ruane, 912 S.W.2d at 781.

In the case sub judice, the Defendant sought to question several defense witnesses on direct examination about threatening and violent conduct committed by the victim against others. The Defendant had no knowledge of this conduct at the time of the shooting. He therefore offered the testimony only to corroborate his claim that the victim was the first aggressor in the altercation which led to the shooting. Given that the evidence was offered for limited corroborative purposes, we conclude that the trial court erred in excluding the testimony. See Ruane, 912 S.W.2d at 779-781.

From our review of the entire record, however, we believe that the error in excluding this testimony was harmless. It is true that the Defendant was not permitted to introduce testimony from several defense witnesses about the victim's threatening and violent conduct toward others. Yet the Defendant was permitted to present testimony from multiple witnesses that the victim had a reputation for violence in the community. In addition, the Defendant himself was

permitted to testify about the victim's threatening and violent conduct toward others of which he was aware at the time of the shooting as proof of his fearful state of mind with respect to the victim. Furthermore, defense witnesses Robert Ferguson and Carroll Votaw were permitted to relate specific threats made by the victim against the Defendant in their presence even though the Defendant was unaware of those threats. While it was error for the trial court to exclude testimony about the victim's specific acts of violence toward others offered for limited corroborative purposes, we are confident that the jury had before it a complete and accurate description of the violent, aggressive nature of the victim. Accordingly, we conclude that the trial court's error did not affect the result of the trial. Tenn. R. Crim. P. 52(a).

## D. Trial Court's Exclusion of Evidence that the Shepard Family was Acting in Concert

The Defendant next contends that the trial court erroneously excluded evidence which would have supported his theory that the Shepard family was acting in concert to threaten and harass him and his family. The substance of most of this evidence was not developed at trial through proffers. The Defendant did request handwriting exemplars from the victim's brother, Jimmy Shepard. The Defendant was apparently seeking evidence to prove that Jimmy Shepard's writing was present on some of the derogatory signs and writings found near the Defendant's neighborhood. The trial court denied the Defendant's request for Jimmy Shepard's handwriting exemplars.

The Defendant argues now, as he argued at trial, that evidence of other Shepard family member's acting in concert with the victim to threaten and harass

him and his family is relevant to explain the relationship between him and the victim as well as his state of mind with respect to the victim. In addition, he asserts that such evidence would have corroborated proof of the victim's violent and aggressive character.

The trial court excluded evidence that the Shepard family was acting in concert, including denying the Defendant's request for handwriting exemplars from Jimmy Shepard, on grounds that it was irrelevant. Tenn. R. Evid. 401, 402. Questions concerning the admissibility of evidence rest within the discretion of the trial court, and we will not interfere with the exercise of that discretion absent abuse. See, e.g., Hutchison, 898 S.W.2d at 172; Hill, 885 S.W.2d at 361 (citation omitted). We agree with the trial court that evidence supporting the Defendant's theory that the Shepard family was acting in concert was largely irrelevant either for corroborative purposes or to establish the Defendant's state of mind with respect to the victim. Moreover, we are confident that the Defendant presented a complete picture of his state of mind and the character of the victim for the jury's consideration. From the record before us, we cannot conclude that the trial judge abused his discretion in excluding this evidence.

### E. Trial Court's Exclusion of Expert Testimony of Dr. Engum

The Defendant next contends that the trial court erroneously excluded portions of the expert psychological testimony offered through defense witness Dr. Eric Engum. More specifically, the trial court did not permit Dr. Engum to testify whether the Defendant's narcissistic and passive-aggressive personality traits were found in the general population. Additionally, the Defendant asserts

that Dr. Engum was not permitted to testify as to the expected response to stress and fear of individuals with narcissistic and passive-aggressive personality types.

The Defendant cites principally two cases in support of his argument, State v. Merlin Eugene Shuck, C.C.A. No. 03C01-9502-CR-00035, Cocke County (Tenn. Crim. App., Knoxville, Feb. 1, 1996), perm. to appeal granted (Tenn. 1996) and State v. Edward H. Jones, C.C.A. No. 03C01-9301-CR-00024, Knox County (Tenn. Crim. App., Knoxville, Sept. 15, 1994). In both Shuck and Jones, however, the trial court excluded an entire category of psychological testimony which was relevant to an important issue at trial. Shuck, C.C.A. No. 03C01-9502-CR-00035, slip op. at 5; Jones, C.C.A. No. 03C01-9301-CR-00024, slip op. at 26. In contrast, Dr. Engum was allowed in the present case to offer an extensive depiction of the Defendant's psychological characteristics as well as his opinion as to whether the Defendant, given those psychological characteristics, perceived the victim's actions as threatening. As a result, we find both Shuck and Jones to be distinguishable from the case sub judice.

In the case at bar, Dr. Engum was permitted to testify at length concerning the narcissistic and passive-aggressive psychological traits of the Defendant. Dr. Engum also testified in detail concerning the general characteristics of individuals with those psychological traits. The trial court permitted Dr. Engum to offer his opinion as to whether the Defendant was suffering from acute stress at the time of the shooting due to the history with the victim and as to whether the Defendant perceived the victim's actions on the day of the shooting as a threat. Furthermore, on redirect, Dr. Engum was permitted to testify concerning the

expected response of passive individuals such as the Defendant to problem situations.

From our review of the record, we believe that Dr. Engum was permitted to give a complete description of the Defendant's psychological traits and what role those traits played in his perception of and reaction to the victim. In our view, any error on the part of the trial court in restricting specific questions posed to Dr. Engum was harmless and did not affect the result of the trial. Tenn. R. Crim. P. 52(a).

## F. Trial Court's Exclusion of Expert Handwriting and Psychological Testimony for Discovery Violations

The Defendant next contends that the trial court erroneously excluded expert testimony on the basis of discovery violations. The Defendant intended to call Dr. Catherine Gyurik and Lamar Miller as expert witnesses at trial. Dr. Gyurik was the Defendant's treating psychiatrist. Lamar Miller was a handwriting expert who had compared the derogatory signs and writings to known examples of the victim's handwriting. Because neither expert had prepared a report detailing their findings, the Defendant had not submitted the results of their analysis to the State as part of reciprocal discovery. See Tenn. R. Crim. P. 16(b)(1)(B). As a result, the prosecutor objected to their testimony when offered at trial. The trial court excluded the testimony of both witnesses on the basis of discovery violations.

Even if we were to agree that the Defendant had violated the discovery provisions of Tennessee Rule of Criminal Procedure 16, we believe that the trial

judge abused his discretion by excluding the testimony of the expert witnesses without even considering other possible remedies. Initially we note that the discovery provisions do not mandate the exclusion of evidence in the wake of a violation of those provisions. See Tenn. R. Crim. P. 16(d)(2). In fact, our courts have long held that evidence should be excluded only where a violation of Rule 16 results in actual prejudice to a party and that prejudice cannot be eradicated by a means other than suppression. State v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984); State v. Briley, 619 S.W.2d 149, 152 (Tenn. Crim. App. 1981); State v. Garland, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981). It appears from the record in the present case that the State was aware of both expert witnesses prior to trial. Defense counsel even consulted with the prosecutor before trial concerning requested subpoenas for handwriting exemplars from Jimmy Shepard. We do not believe that the State suffered actual prejudice as a result of the purported discovery violation. Furthermore, we believe that other means were available to the trial court to resolve the situation. In fact, the Defendant even offered to allow the prosecutor to interview the handwriting expert during a continuance. The trial court, however, did not consider any alternatives to exclusion. Accordingly, we conclude that exclusion of the Defendant's expert evidence was not appropriate in this case and the trial court erred in so ruling.

In our view, the exclusion of the testimony of the Defendant's expert witnesses was nevertheless harmless error. The record is unclear as to what Dr. Gyurik's testimony would have been. The Defendant does concede that her testimony would have been largely cumulative of Dr. Engum. He asserts that her testimony would have been useful to rebut the false impression that Dr. Engum

learned of the alleged bump between the vehicles from the Defendant. It appears that Dr. Engum rebutted that impression himself on redirect examination. We believe that Dr. Engum provided a thorough explanation of the Defendant's psychological characteristics and that Dr. Gyurik's testimony would have added little to Dr. Engum's testimony. We therefore conclude that the exclusion of her testimony did not affect the result of the trial. Tenn. R. Crim. P. 52(a).

With regard to the expert handwriting evidence, it appears that Lamar Miller would have testified that some of the derogatory signs and writing contained handwriting matching known examples of the victim's handwriting. In spite of the exclusion of the expert testimony, the Defendant was permitted to offer lay testimony from several witnesses who stated that they recognized the victim's handwriting on the derogatory signs and writings. Furthermore, the State did not seriously contest that testimony. We are confident that the jury had ample evidence before it to assess the source of the derogatory signs and writings. Accordingly, we conclude that the exclusion of the expert handwriting testimony did not affect the result of the trial. Tenn. R. Crim. P. 52(a).

### G.  Trial Court's Exclusion of Expert Testimony of Accident Reconstructionist for Discovery Violation

In a related issue, the Defendant also contends that the trial court erroneously excluded the expert testimony of an accident reconstructionist on the basis of a discovery violation. During the State's case-in-chief, defense counsel cross-examined several witnesses with the aid of a large, professionally-prepared diagram of the scene of the shooting. The prosecutor voiced some concern that the diagram was "proportional" rather than "to scale." As a result, it appears that

during the course of the trial the Defendant employed an accident reconstructionist, John Hyde, to render the diagram "to scale." When the Defendant called Hyde to testify, the prosecutor objected to his rendering the diagram to scale. The prosecutor asserted that he had not received a report detailing the expert's findings. As a result, the trial court excluded any of Hyde's testimony aimed at placing the diagram to scale.

Regardless of our conclusion about the propriety of the trial court's exclusion of the evidence on the basis of a discovery violation, we do not believe that the Defendant has demonstrated any prejudice resulting from the trial court's ruling. In fact, the Defendant's brief does not allege that he was prejudiced in any way. Moreover, the trial court permitted Hyde to testify that in his expert opinion, an individual stopped at the intersection would not have been able to see the rear of the victim's truck or the front of the Defendant's van if the scene were as it had been described during the State's proof. From our review of the record, it seems that the importance of rendering the diagram to scale would have been to suggest that the State's witnesses to the shooting were not in a position to see the rear of the truck or the front of the van. Accordingly, we can only conclude that the exclusion of that portion of Hyde's expert testimony aimed at rendering the diagram to scale did not affect the result of the trial. Tenn. R. Crim. P. 52(a).

## H. Trial Court's Exclusion of Expert Testimony Concerning Pretrial Preparation of Witnesses

The Defendant also contends that the trial court erroneously excluded expert testimony concerning pretrial preparation of witnesses. In response to the prosecutor's cross-examination of the Defendant with regard to his pretrial

preparation, defense counsel sought to introduce expert testimony from Thomas Dillard. Dillard, a seasoned prosecutor and defense attorney, would have testified that pretrial preparation of witnesses is common and expected. We addressed the propriety of the trial court's ruling in this regard as part of the third issue on appeal.

## I. Conclusion Regarding Trial Court's Evidentiary Rulings

As we explained above, the trial court did make several erroneous evidentiary rulings during the course of this lengthy trial. After considering the entire record, however, we do not believe that any of these errors affected the verdict. See Tenn. R. Crim. P. 52(a). Furthermore, we simply cannot conclude that the trial court's erroneous evidentiary rulings deprived the Defendant of a meaningful opportunity to present a complete and effective defense. In our view, the trial court's errors were harmless beyond a reasonable doubt. See Chapman, 386 U.S. at 24, 87 S.Ct. at 828; Bigbee, 885 S.W.2d at 809. The fourth issue is therefore without merit.

## VI. TRIAL COURT'S DEMEANOR AND JUDICIAL BIAS

In the fifth issue, the Defendant argues that the trial court's demeanor and conduct denied him due process of law. The Defendant contends that the trial court did not display the required objectivity or neutrality during the course of the trial and that the lack of objectivity had a prejudicial effect on the credibility of defense witnesses and the claim of self-defense. He points to numerous

comments and evidentiary rulings which, he alleges, cumulatively demonstrate a prejudicial judicial bias against him.

Canon 3(A) of the Code of Judicial Conduct indicates that a trial judge should maintain order and decorum at trial but should be patient, dignified and courteous to the litigants, jurors, witnesses and lawyers. Tenn. Sup. Ct. R. 10. The trial judge must be careful to avoid doing or saying anything that might prejudice the rights of the parties in the case. See Pique v. State, 480 S.W.2d 546, 550 (Tenn. Crim. App. 1971). Furthermore, the Tennessee Constitution specifically prohibits judges from commenting upon the credibility of witnesses or upon the evidence in the case. Tenn. Const. art. VI, § 9. As a result, a trial judge must refrain from giving the jury any impression as to his or her feelings about the evidence or making any comment which might reflect on or influence the jury regarding the weight or credibility of evidence. See State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 743, 130 L.Ed.2d 644 (1995); State v. Suttles, 767 S.W.2d 403, 406-07 (Tenn. 1989); Collins v. State, 220 Tenn. 275, 416 S.W.2d 766 (1967). As our supreme court has stated, "a trial judge should not express any thought that would lead the jury to infer that his opinion was in favor of or against a defendant in a criminal trial." State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

## A. Trial Court's Comments

The Defendant challenges several comments made by the trial judge during the course of the trial.[13] Among the challenged comments is an instruction given by the trial court to defense witnesses on several occasions. During cross-examination of several defense witnesses, the prosecutor objected to the manner of answering his questions. In response to the prosecutor's objections, the trial court instructed the witnesses as follows: "When you are asked a question, answer yes or no, either one; then, if you have an explanation, you may give it. However, do not volunteer any information beyond that which answers the question. If the attorney wants more information, he'll ask for it."

Of course, the propriety, scope, manner and control of examination of witnesses is entrusted to the sound discretion of the trial court and will not be interfered with absent an abuse of that discretion. Hutchison, 898 S.W.2d at 172; Harris, 839 S.W.2d at 72. We find no error with regard to the trial court's instruction, nor do we find any indication of judicial bias against the Defendant. The instructions were given to defense witnesses upon the prosecutor's objection to their manner of responding on cross-examination. No similar objections were made by the Defendant and, thus, no similar objections by the Defendant were denied by the trial court. We do not believe that the trial judge's instruction conveyed any impression from which the jury could reasonably conclude that he did not find the testimony of defense witnesses to be credible.

---

[13] We note that, in addition to the transcribed record, the Defendant included audiotaped portions of the record pertinent to this issue. We have reviewed those tapes as well as the written record to arrive at our conclusions regarding this issue on appeal.

The Defendant challenges another instruction given several times to defense witnesses at the request of the prosecutor. The trial court instructed later defense witnesses as follows: "You are reminded that you may not testify to a matter unless you have personal knowledge of that matter." No such instruction was ever requested by the Defendant with regard to testimony from State's witnesses. We find nothing improper in the trial court's instruction. See Tenn. R. Evid. 602. The clear import of the trial court's instruction was to ensure that witnesses understood that their testimony must be based on their own knowledge rather than on what others had told them. Furthermore, we do not believe that the trial judge's instruction conveyed any impression from which the jury could reasonably conclude that he did not find the testimony of defense witnesses to be credible.

The Defendant challenges numerous other comments made by the trial court during examination of several defense witnesses. We do not feel the need to examine these challenges one by one. As we stated above, the propriety, scope, manner and control of examination of witnesses is entrusted to the sound discretion of the trial court and will not be interfered with absent an abuse of that discretion. Hutchison, 898 S.W.2d at 172; Harris, 839 S.W.2d at 72. The vast majority of challenged comments were a sound exercise of the discretion of the trial court. We do not believe that any of that vast majority of comments reflected upon the credibility of defense witnesses or the Defendant's claim of self-defense.

After a careful review of the Defendant's allegations, we find only one which has a significant degree of merit. During the direct examination of the

Defendant, a bench conference occurred in which the trial court instructed defense counsel not to delve into the fact that the Defendant prayed with the youth minister of his church about the situation with the victim on the morning of the shooting. When direct examination resumed, defense counsel asked the Defendant a relevant, open-ended, non-leading question. The Defendant, not knowing what had been discussed at the bench conference, mentioned the fact that he and his wife had prayed with the youth minister. The prosecutor immediately objected and stated, "Your Honor, this, obviously, shows . . . his testimony is rehearsed . . . ." The trial judge responded by commenting, "Yes, yes."

We believe that the trial court's response to the prosecutor's objection was improper. The prosecutor's objection, taken in context with other remarks made during the trial, was a clear attempt to imply that the Defendant's testimony was not credible. The trial judge's affirmative response conveyed an impression from which the jury could have reasonably concluded that the trial judge did not find the Defendant to be a credible witness. In fact, this impression becomes clearer when we consider other remarks made by the trial court out of the jury's hearing when defense counsel objected to both the prosecutor's and the judge's comments and requested a curative instruction. In declining to give a curative instruction, the trial court stated that there was "a strong suspicion" that the Defendant's testimony was rehearsed and, thus, there was "probable cause" for the prosecutor's comment.

We do not, however, believe that the trial court's comment deprived the Defendant of his constitutional right to a fair trial. The improper comment was a

single remark made during the course of a three-week trial. The Defendant's credibility was much more vigorously questioned through effective cross-examination. Considering the record in its entirety, we are confident that the trial court's improper remark did not affect the outcome of the trial. See Tenn. R. Crim. P. 52(a). The error was harmless beyond a reasonable doubt. See Chapman, 386 U.S. at 24, 87 S.Ct. at 828; Bigbee, 885 S.W.2d at 809.

## B. Trial Court's Evidentiary Rulings

The Defendant also challenges several evidentiary rulings made by the trial court during the course of the trial, arguing that they demonstrate a judicial bias which adversely affected the credibility of his proof and deprived him of a fair trial. The first of these challenges concerns the admissibility of criminal records. The Defendant contends that the trial court favored the State with regard to the admissibility of the criminal records of himself, the victim and State's witness Gary Massengill.

We can find no indication of bias in the trial court's rulings regarding the admissibility of criminal records. In fact, we point out that proof of the Defendant's criminal record was never introduced at trial. Massengill's criminal record was excluded because the convictions were fourteen years old and the Defendant did not provide adequate notice of his intention to use the evidence.[14] See Tenn. R. Evid. 609(b). In addition, although the Defendant was allowed to testify as to his knowledge of the criminal record of the victim, certified copies of

---

[14] It appears that Massengill's criminal record included convictions for burglary and receiving stolen property, all from 1980.

the victim's convictions were ruled inadmissible by the trial court. Noting that the victim's convictions were for a driver's license violation, public drunkenness, and manufacturing marijuana, the trial court ruled that the convictions were not probative of the victim's character for violence or aggressiveness. See State v. Furlough, 797 S.W.2d 631, 650 (Tenn. Crim. App. 1990); Tenn. R. Evid. 404(a)(2). From our review of the record, we can discern no evidence of judicial misconduct or bias with regard to these rulings.

As his second challenge, the Defendant contends that the trial court exhibited bias against him by restricting him from making necessary proffers and by denying requests for jury-out hearings. The Defendant argues that the trial court's language and manner of addressing his requests adversely affected the credibility of his proof. The record reveals that, at times, the trial court seemed somewhat frustrated at the prospect of continuously sending the jury out for proffers and hearings. In fact, on one occasion the trial court stated, "Oh, I hate to send this jury out. I am sorry. You will have to step out." In his brief, the Defendant sets forth a litany of exchanges between defense counsel and the trial court in which the trial court is somewhat gruff with defense counsel. We do not feel the need to list those exchanges here.

We agree that a trial judge must not allow personal irritations to ruffle his or her judicial demeanor during trial. Brooks v. State, 187 Tenn. 67, 213 S.W.2d 7 (1948), cert. denied, 340 U.S. 837, 71 S.Ct. 21, 95 L.Ed. 614 (1950). Although the trial judge was sometimes curt with defense counsel regarding proffer and jury-out hearing requests, we do not believe that the trial judge's language or rulings exhibited any bias or constituted misconduct. We are confident that the

trial court's demeanor did not adversely impact the credibility of the Defendant's proof.

As his third challenge, the Defendant contends that the trial court favored the State with regard to the scope of cross-examination of character witnesses. The Defendant sought to call several character witnesses during his proof to testify regarding his character for truthfulness. At a jury-out hearing on the subject, the prosecutor voiced his intention to ask the Defendant's character witnesses if they had heard that the Defendant had left the scene of the shooting, had discarded the bullets remaining in the gun, had placed the gun in an eave of his carport, and had initially denied knowledge of the shooting when speaking to police officers. The trial court ruled that the prosecutor's questions would be allowed on cross-examination. As a result, the Defendant decided not to call his character witnesses to testify.

After the conclusion of the Defendant's proof, the State called F.B.I. Agent Don Provonsha to testify in rebuttal. Provonsha testified that defense witness Robert Ferguson had a poor reputation for truthfulness. On cross-examination, defense counsel sought to ask Provonsha if he had heard that Ferguson had signed a written statement and whether that fact would change Provonsha's testimony. The trial court did not permit defense counsel's questions.

We find no evidence of judicial bias in these rulings. The trial court's ruling with regard to cross-examination of the Defendant's character witnesses was supported by Tennessee Rule of Evidence 405(a). Although it may have been error for the trial court not to permit the Defendant's questions of Agent

Provonsha, we discern no judicial bias in the ruling. Furthermore, any error concerning the restricted questioning of Provonsha was harmless. Tenn. R. Crim. P. 52(a). The jury was aware that Ferguson had signed a written statement from the questioning of Ferguson himself. In fact, defense counsel emphasized the significance of signing the written statement during his examination of Ferguson.

As his fourth challenge, the Defendant contends that the trial court favored the State regarding the exclusion of evidence as a sanction for discovery violations. See Tenn. R. Evid. 16(d)(2). The Defendant points out that the expert psychological testimony of Dr. Catherine Gyurik on the Defendant's mental state was excluded on the basis that the Defendant had not provided the State with a report detailing Gyurik's conclusions. In addition, the testimony of Lamar Miller, the Defendant's handwriting expert, on the subject of whether the derogatory writing on the signs introduced by the Defendant matched known samples of the victim's handwriting was also excluded on the basis that the Defendant had not provided the State with a report detailing Miller's conclusions. The Defendant argues that these rulings are in sharp contrast to the trial court's rulings with regard to the Defendant's prior convictions even though the trial court found that the State had not provided the Defendant with notice of its intention to use that evidence at trial.

We find no evidence of a judicial bias in these rulings. As we discussed above, we believe that the trial court's exclusion of the testimony of the Defendant's experts on the basis of discovery violations was an abuse of discretion. We do not believe, however, that the trial court's errors reflect a

judicial bias against the Defendant. In contrast to the exclusion of the Defendant's proof, it is quite clear that the State's questions concerning the Defendant's prior convictions did not involve a discovery violation. Instead, the trial court noted that the State had failed to provide adequate notice of its intention to use that evidence in violation of Rules 608 and 609 of the Tennessee Rules of Evidence. The trial judge allowed the State's questions in spite of the notice violation because he found that the Defendant had made a sweeping claim of good conduct. Again, as we explained above, we believe that the trial court erred in finding that the Defendant had made a sweeping claim of good conduct. Yet we see no indication that the trial judge was biased against the Defendant or that he favored the State with regard to the exclusion of evidence as a sanction for discovery violations.

As his fifth challenge, the Defendant argues that the trial court favored the State with regard to the admission of prior consistent statements to rebut a claim of recent fabrication. The Defendant points out that the trial court often restricted the testimony of defense witnesses regarding specific details the Defendant had told them concerning the harassment by the victim. The trial court allowed defense witnesses to testify about the perceived mental state of the Defendant but did not allow them to testify about the incidents of harassment and threats related to them by the Defendant which formed the basis for the Defendant's mental state.

The Defendant contrasts those rulings with the trial court's allowance of questions to State's witness Gary Massengill on redirect concerning a statement he had given to police officers. On cross-examination, defense counsel

questioned Massengill about written statements he had given to police officers after the shooting in an effort to impeach his testimony on direct examination. It appears that the statements were actually written by police officers as Massengill orally related his account of the shooting to them. On redirect, the prosecutor asked Massengill whether he had signed those statements. Massengill testified that he had not been asked to sign them. The prosecutor also asked Massengill whether he told those police officers the same account that he testified to on direct examination. Massengill responded affirmatively.

We note that although defense counsel objected to the leading nature of some of the prosecutor's questions, he did not object to the substance of these questions at trial. As we explained above, it may have been error for the trial court to restrict the testimony of defense witnesses. We do not, however, see any indication of disparate treatment or judicial bias against the Defendant in these rulings.

As his sixth challenge, the Defendant argues that the trial court favored the State by denying a closure of the courtroom for one of his witnesses to testify. According to the witness' proffer, he intended to testify concerning violent acts committed by the victim against him. The proffer also makes clear that the witness feared retaliation by the Shepard family against his family should he testify. As a result, the Defendant requested that the trial court exclude spectators and the media from the courtroom during the witness' testimony. The trial court denied the Defendant's request for a closure of the courtroom. The witness in question, David Riley, did eventually testify concerning his opinion of the victim's character for violence and aggressiveness. Before Riley testified,

defense counsel expressed concern that the witness would have to walk past the Shepard family as he entered the courtroom.[15] As a result, the trial court allowed Riley to enter through the back door of the courtroom so as to avoid any meeting with the Shepard family.

Initially, we observe that the Defendant asserts that the closure requested constituted a partial closure. We believe that the closure requested was a complete closure in that the Defendant sought to have all spectators and media excluded from the courtroom, leaving only the attorneys, court personnel, the Defendant and the witness. See State v. Sams, 802 S.W.2d 635, 640 (Tenn. Crim. App. 1990). Given that the Shepard family members were already excluded from the courtroom pursuant to Tennessee Rule of Evidence 615, the Defendant's request was, in effect, an effort to conceal the very identity of the witness. The Defendant argues that the trial judge did not properly weigh the appropriate interests in arriving at his decision to deny the closure. At a jury-out hearing on the subject, the trial court found that the facts set forth in the affidavit of the witness concerning possible retaliation by the Shepard family did not require closure and that a closure could not provide the relief requested, namely concealing the identity of the witness. The trial court found further that the public interest in open proceedings outweighed the fair trial interests advanced by the Defendant.

_____

[15] The record reveals that the members of the victim's immediate family were subpoenaed by the Defendant. Apparently, defense counsel originally intended to call them as hostile witnesses and question them about the victim's alleged prior violent acts. The trial court eventually ruled evidence of the victim's violent acts against individuals other than the Defendant inadmissible. Nevertheless, the family members remained excluded from the courtroom itself pursuant to Tennessee Rule of Evidence 615 and, according to the Defendant, they congregated near the door to the courtroom throughout the trial.

Our supreme court discussed the proper determination of complete closure requests in State v. Drake, 701 S.W.2d 604 (Tenn. 1985). The court quoted with approval from a United States Supreme Court case as follows:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

Id. at 608 (quoting from Waller v. Georgia, 467 U.S. 39, 104 S.Ct. 2210, 2216, 81 L.Ed.2d 31 (1984)); accord Globe Newspaper Co. v. Superior Court for the County of Norfolk, 457 U.S. 596, 606-07, 102 S.Ct. 2613, 2620-21, 73 L.Ed.2d 248 (1982).

In the case sub judice, the trial court implicitly found that the Defendant had not advanced an overriding interest likely to be prejudiced in the absence of a complete closure. From our review of the record, we agree with the implicit ruling of the trial court that the Defendant did not demonstrate an overriding interest likely to be prejudiced. Furthermore, we find no evidence of disparate treatment of or judicial bias against the Defendant with regard to the trial court's closure ruling.

In summary, as we discussed above, the trial court certainly made errors during the course of this often contentious, three-week trial. Given the length of the trial, the volume of evidence and the complexity of the legal issues involved, it is not surprising that there were some erroneous evidentiary rulings and improper comments. Yet we find no indication in those errors that the trial court exhibited a bias against the Defendant. Instead, we can only conclude that the trial court's demeanor and rulings did not improperly favor the State or have a

prejudicial effect on the credibility of the Defendant's proof in support of his claim of self-defense.  This issue is therefore without merit.

## VII.  PROSECUTORIAL MISCONDUCT

In the sixth issue, the Defendant challenges numerous actions of the assistant district attorney general which he contends constituted prosecutorial misconduct.  In Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758 (1965), our supreme court set forth the test to be applied by an appellate court in reviewing instances of improper conduct.  The relevant inquiry is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Id. at 340, 385 S.W.2d at 759.  In Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this Court noted five factors generally accepted as those to be considered in making the determination of whether improper conduct affected the verdict to a defendant's prejudice.  Those factors are:

1.    the conduct complained of viewed in context and in light of the facts and circumstances of the case;
2.    the curative measures undertaken by the trial court and the prosecution;
3.    the intent of the prosecutor in making the improper statement;
4.    the cumulative effect of the improper conduct and any other errors in the record; and,
5.    the relative strength or weakness of the case.

Id. at 344.  The Defendant cites many instances of conduct which he believes to have been improper and divides them into several categories in his brief.  For the sake of clarity, we will address the instances of alleged misconduct as they are categorized in the Defendant's brief.  We will address the effect of any errors after examining all of the categories of misconduct raised by the Defendant.

## A. Categories of Alleged Prosecutorial Misconduct

### 1. Misrepresentative Remarks about the Defendant's Claim of Self-Defense

The Defendant complains of several remarks made by the prosecutor concerning his theory of self-defense. For instance, the Defendant asserts that the prosecutor misrepresented the proof adduced at trial by arguing to the jury that the Defendant's van bumped the victim's truck. The Defendant contends that the clear weight of the evidence, including the testimony of the State's witnesses, indicates that there was no contact between the vehicles. State's witness Gary Massengill, however, did testify that the van bumped the truck from behind. Massengill, being a passenger in the truck, was the State's witness who was in the best position to testify about the alleged bump. Although the State's other witnesses did not see any contact between the vehicles, we believe that the prosecutor's references to the alleged bump were not improper given Massengill's testimony that such a bump had occurred.

The Defendant also complains of the prosecutor's questions to Dr. Engum concerning the alleged bump. As we detailed above, Dr. Engum testified on cross-examination that, to the best of his recollection, he remembered being informed about some contact between the vehicles. Engum believed he had learned this information from the Defendant and clearly remembered discussing it with defense counsel. On redirect, Engum reviewed the notes he had taken as he spoke with the Defendant. Upon reviewing the notes, Engum testified that he believed he had learned about the alleged bump solely from defense counsel rather than from the Defendant. On recross, the prosecutor questioned Engum about the slight inconsistency between his testimony on cross-examination and

on redirect. The Defendant contends that the prosecutor improperly explored the inconsistency in Engum's testimony because Engum had, on redirect, merely clarified a mistake he had made on cross-examination due to his not being able to consult his notes from interviews with the Defendant. We believe, however, that the prosecutor was entitled to question Engum about the change or "clarification" in his testimony, and we find nothing improper in his questioning as detailed in the record.

The Defendant next complains of the prosecutor's comment that the defense was "putting up a bogus self defense theory that has been constructed after the fact." These comments, however, were made to the trial court during a jury-out hearing. We can find no prejudice inuring to the Defendant as a result of these comments.

Somewhat similar comments were made by the prosecutor to the jury during closing argument:

> [MR. JOLLEY:] And let's talk about the bumping. If you're really concerned about what happened, wouldn't you bump the truck and let them know you were there? . . . You don't wave at them as they go by at the stop sign and talk about being scared by the glare that they look at your eyes. No. That's all hokum--
> MR. MONCIER: Objection.
> MR. JOLLEY: --that's been made up--
> MR. MONCIER: Objection.
> THE COURT: Yes, General, rephrase that.
> MR. JOLLEY: We suggest to you that that has been made up--
> MR. MONCIER: Object.
> THE COURT: Overruled.
> MR. JOLLEY: --afterwards to cover self-defense. . . .

The Defendant contends that these comments constituted prosecutorial misconduct. Of course, it is improper for a prosecutor to express to the jury his or her personal belief or opinion as to the truth or falsity of testimony or evidence.

See, e.g., State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989), cert. denied, 497 U.S. 1031, 110 S.Ct. 3291, 111 L.Ed.2d 800 (1990); State v. Hicks, 618 S.W.2d 510, 517 (Tenn. Crim. App. 1981); see also David Louis Raybin, Tennessee Criminal Practice and Procedure, § 29.31. Tennessee courts have recognized, however, that the specific terminology used by the prosecutor is important in determining whether such comments qualify as misconduct. Typically, comments prefaced by "I think" or "I submit" do not constitute impermissible personal opinions. See Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995). In the present case, the prosecutor's initial comments were objected to by the Defendant and were corrected by the trial court. We do not believe that the prosecutor's comments prefaced by "we suggest" were an improper personal comment upon the truth or falsity of the Defendant's self-defense theory.[16]

The Defendant also complains about remarks concerning the victim's approach to the van. During closing argument, the prosecutor made the following comments:

> MR. JOLLEY: Intentional, premeditated, deliberate. Sitting and waiting as Rod Shepard walked back to the truck with his hands in the air, showing that he's unarmed--
> MR. MONCIER: Objection.
> MR. JOLLEY: --or his left hand in his pocket--
> THE COURT: Overruled.
> MR. JOLLEY: --swinging his arm to his side, or his right hand in his pocket up to the top, as Mrs. Joslin says, or all the way in , as Mr. Joslin says.

The Defendant argues that the prosecutor's comments about the victim walking back to the van "with his hands in the air" is a mischaracterization of the evidence

---

[16] The Defendant complains of other instances of similar language used by the prosecutor. For instance, one such complaint is directed toward the prosecutor's argument to the jury, "I suggest it didn't happen that way." That remark was directed toward the Defendant's testimony and proof that the victim reached into the van before he was fatally shot. Applying the same reasoning outlined above, we do not believe that these remarks were an improper statement of personal belief or opinion concerning the truth or falsity of the Defendant's proof.

given that State's witnesses Judy Allen and Michelle Flatt testified that the victim's left hand was in his pants pocket. State's witness Phillip Murphy, however, testified that the victim's hands were not in his pockets, but rather were being used to gesture to the Defendant. Moreover, we view the prosecutor's remarks as attempting to explain the differing testimony and to suggest that, no matter which testimony is accredited, the result of the trial should be the same. From our review, we conclude that the prosecutor's comments were not improper.

**2. Remarks Conveying a Personal Belief about the Credibility and Guilt of the Defendant**

The Defendant next complains of several remarks by the prosecutor which he argues improperly conveyed the prosecutor's personal beliefs regarding the credibility of the Defendant's proof and the guilt of the Defendant himself. As we stated above, it is improper for a prosecutor to express to the jury his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. Henley, 774 S.W.2d at 911; Hicks, 618 S.W.2d at 517; Sneed v. State, 546 S.W.2d 254, 261 (Tenn. Crim. App. 1976).

Several of the remarks complained of by the Defendant on appeal were, we believe, either cured at trial or were simply not improper. For example, the Defendant complains of the prosecutor's actions in "slamming" down his hand or finger while he was criticizing defense counsel for interrupting his argument. These actions were made during a jury-out hearing though, and we can find no prejudice inuring to the Defendant as a result of them. In addition, the Defendant complains of a sarcastic remark by the prosecutor to the Defendant during cross-

examination that "[t]hat's good that you can tell it in the same words that you said before, Mr. Joslin." The Defendant objected to this remark, and the trial court sustained the objection and gave a curative instruction for the jury to disregard the statement. In the absence of proof to the contrary, we must presume that the jury followed the trial court's curative instruction. See State v. Compton, 642 S.W.2d 745, 746 (Tenn. Crim. App. 1982); Frazier v. State, 566 S.W.2d 545, 551 (Tenn. Crim. App. 1977) (citations omitted). Thus, we conclude that the trial court's instruction cured any error posed by the prosecutor's remark.

There were, however, several comments made by the prosecutor which we believe were improper in that they effectively conveyed the prosecutor's personal beliefs about the credibility of the Defendant's proof. The Defendant complains of an objection made by the prosecutor in the presence of the jury, stating that the Defendant's response to a question on direct examination "obviously shows his testimony is rehearsed." The State now concedes that the prosecutor's remark was improper and, given the context of defense counsel's question and the Defendant's response, we agree.

The Defendant also complains of another comment made by the prosecutor during the direct examination of the Defendant. As the Defendant began to testify about the events of October 28, 1992, the day he and his wife sold the Dante Road home to Carroll Votaw and received the first threatening telephone call from the victim, he apparently became somewhat emotional. Defense counsel asked the Defendant to calm down and offered him a glass of water. At that point, the prosecutor, referring to the Defendant's emotional response, stated "Your Honor, there's no reason to be upset by this type of--."

We believe that, by making this comment, the prosecutor was personally commenting on the sincerity and credibility of the Defendant's testimony. Such comments have been addressed by Tennessee courts before and have been condemned as being improper. See State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991), cert. denied, 502 U.S. 841, 112 S.Ct. 131, 116 L.Ed.2d 98 (1991).

In addition, the Defendant complains about a remark made by the prosecutor during closing argument.

> MR. JOLLEY: Mr. Moncier talks about witnesses who weren't called. Well, if witnesses don't know anything, they have no business on the stand, unlike witnesses, Dr. I-am-not-a-liar Engum, who changes his testimony--
> MR. MONCIER: Objection, your Honor.
> THE COURT: Overruled.
> MR. JOLLEY: --about whether or not Mr. Joslin told him that he bumped the vehicle after a conversation with Mr. Moncier.

Certainly the prosecutor was entitled to comment on the change in Dr. Engum's testimony, just as defense counsel would have been entitled to argue to the jury that Dr. Engum had merely clarified his previous testimony after refreshing his memory by reviewing his interview notes. It has long been the law in Tennessee, however, that a prosecutor should refrain from inflaming the jury with intemperate argument. See, e.g., State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978); Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976); see generally Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed.2d 1314 (1935). Thus, we believe that the prosecutor's manner of referring to the witness was improper.

### 3. Cross-examination of the Defendant Concerning Pretrial Preparation with his Attorneys

The Defendant next complains of an entire line of questioning on the part of the prosecutor. The questions occurred during cross-examination of the

Defendant and generally involved the Defendant's pretrial preparation with his attorneys. The Defendant raised essentially the same issue, but challenging both the prosecutor's actions and the trial court's rulings, as his third issue on appeal. We addressed the issue in its entirety, including whether the prosecutor's actions constituted misconduct, when we discussed the Defendant's third issue.

### 4. Remarks Accusing Defense Counsel of Soliciting False Testimony through Robert Ferguson

We detailed in our discussion of the facts above the unusual course of testimony by defense witness Robert Ferguson. Ferguson testified on direct examination that he believed the victim to have been a peaceful person ninety-nine percent of the time. During direct examination, however, Ferguson was confronted with a written statement he had given to defense counsel in which he stated that the victim was a violent, aggressive person and that he had overheard the victim threatening the Defendant. Although Ferguson's initial testimony may have surprised defense counsel to some degree, direct examination was rather ordinary.

During a jury-out hearing before cross-examination, Ferguson testified that defense counsel had urged him to exaggerate the violent nature of the victim. These statements led defense counsel to reveal that he had tape recorded his conversations with Ferguson. After a controversy about whether the prosecutor could review those tapes alone, defense counsel refused to offer the tapes as Jencks material.[17] The trial court ordered Ferguson's testimony stricken, but the prosecutor requested an alternative remedy. The trial court allowed Ferguson's

---

[17] See Tenn. R. Crim. P. 26.2.

testimony to remain, but permitted the prosecutor to question him about the allegations that defense counsel had urged him to exaggerate his testimony.

After a thorough review of the prosecutor's cross-examination of Ferguson, we find nothing improper in the questioning. Ferguson himself brought up the subject during a jury-out hearing. Certainly allegations of that nature are entitled to be explored by opposing counsel. The prosecutor asked a series of simple questions intended to allow Ferguson to explain the type of request made by defense counsel with regard to Ferguson's expected testimony at trial. The Defendant complains specifically about a comment made by the prosecutor during the course of Ferguson's testimony that defense counsel was "making stuff out of whole cloth." This remark occurred during a jury-out hearing though. A similar remark was made in the presence of the jury, but the trial court instructed the jury to disregard it. We must presume that the jury followed the trial court's curative instruction. See Compton, 642 S.W.2d at 746; Frazier, 566 S.W.2d at 551. The Defendant also complains about a remark made by the prosecutor during closing argument that "he [Ferguson] told you that Mr. Moncier was trying to get him to lie about it and all these things." Defense counsel objected, and the trial court instructed the prosecutor not to go into that subject. From our review, we believe that the prosecutor's actions did not constitute misconduct.[18]

---

[18] We note that the Defendant also challenges the trial court's evidentiary rulings with regard to Ferguson's testimony. We addressed the propriety of various rulings of the trial court concerning Ferguson's testimony as part of the fourth and fifth issues on appeal.

### 5. Remarks Accusing Defense Witness Dean Joslin of Fabricating Evidence

The Defendant next complains about comments made by the prosecutor during closing argument referring to Dean Joslin's identification of an exhibit at trial. As we detailed above in our discussion of the facts, Dean Joslin testified that he was one of the Defendant's sons. He operated an automotive repair shop out of a commercial building owned by the Defendant and rented to him. He arrived there one day and discovered that the garage door had been severely dented by a vehicle. He found red paint matching the color of the victim's truck and eventually came to believe that the victim had been responsible for the damage. He measured the height of the dent and measured the height of the bumper of a truck identical to the victim's truck. At trial, the Defendant introduced a photograph of Dean Joslin measuring the height of the bumper of the matching truck. Dean Joslin then identified a photograph of the Defendant's truck, exhibit number fifty-six (56), which he testified was taken after the garage door damage incident.

In all, the testimony of Dean Joslin with regard to exhibit number 56, including cross-examination, was relatively uneventful. It was subsequently discovered during the testimony of Daniel Joslin that, in exhibit number 56, the license plate of the victim's truck had not been issued until May of 1994, after the shooting of the victim. Thus, it appeared that Dean Joslin's identification of the photograph as having been taken shortly after the damage to his garage was mistaken.

As a result, the prosecutor commented to the jury during closing argument that the misidentification was an indication of bias on the part of Dean Joslin. We believe that although the misidentification did not have great probative value, the prosecutor was entitled to suggest to the jury that Dean Joslin's misidentification of the picture reflected negatively on his credibility. Accordingly, we conclude that the prosecutor's actions did not constitute misconduct.

### 6. Remarks Accusing John Isaac Joslin and Geneva Joslin of Testifying Falsely about Telephone Calls from the Victim

The Defendant next complains about the prosecutor's cross-examination of John Isaac Joslin and Geneva Joslin, the adolescent children of the Defendant. Both children testified on direct examination that they had received threatening and vulgar telephone calls from the victim. On cross-examination of John Isaac Joslin, the prosecutor called attention to the fact that John Isaac Joslin described the frequency of the telephone calls in the same language that the Defendant had used when testifying earlier. On cross-examination of Geneva Joslin, the prosecutor questioned whether the witness had spoken with the victim enough to be able to identify his voice on the threatening calls. We find nothing improper in the prosecutor's cross-examination of these two witnesses.

### 7. Remarks Accusing Sandra Joslin of "Creating a Defense"

The Defendant next complains of the prosecutor's cross-examination of defense witness Sandra Joslin and his subsequent argument to the jury concerning that testimony. As we mentioned above in our recitation of the facts, Sandra Joslin, the Defendant's wife, testified on direct examination that as the victim approached their van, he shouted "I'll kill you mother-fuckers." On cross-

examination, the prosecutor confronted Sandra Joslin with a deposition in which she stated that the victim had used the singular rather than the plural. Given this conflict, the prosecutor asked the witness whether the victim had used the singular or the plural. Sandra Joslin wavered somewhat in answering and, as a result, the prosecutor asked her essentially the same question numerous times over the Defendant's objection. Sandra Joslin eventually testified that she could not be sure whether the victim had used the singular or plural.

During closing argument to the jury, the prosecutor stressed that Sandra Joslin's testimony had changed between the deposition and direct examination at trial. The prosecutor suggested that she had changed her testimony in order to allow the Defendant to raise a defense of a third person claim.

We do not believe that questioning Sandra Joslin concerning the change in her testimony or suggesting to the jury during closing argument a reason for that change constituted prosecutorial misconduct. Although the trial court may have erred in allowing the repetitive "singular/plural" questions, we find nothing improper in the prosecutor's conduct.

**8. Remarks Concerning the Burden of Proof**

The Defendant's final allegation of prosecutorial misconduct involves remarks made by the prosecutor which the Defendant argues misconstrued the burden of proof and the Defendant's constitutional rights. During closing argument, the prosecutor commented on defense proof of the victim's violent, aggressive character and conduct. The prosecutor spoke of the Defendant's

proof as innuendo and an attempt to construct a defense. He also made the following remarks:

> MR. JOLLEY: Rodney Shepard is entitled to equal protection under the law.
> MR. MONCIER: Objection, your Honor.
> THE COURT: Overruled.
> MR. JOLLEY: Rodney Shepard is entitled to a presumption of innocence.
> MR. MONCIER: Objection, your Honor.
> MR. JOLLEY: Rodney Shepard is entitled--
> THE COURT: Overruled.
> MR. JOLLEY: --to proof beyond a reasonable doubt.
> MR. MONCIER: Objection, your Honor.
> THE COURT: Well, members ... of the jury, I will instruct as to the law. All right, General, proceed.

The Defendant contends that the prosecutor's argument improperly shifted the burden of proof and misconstrued the constitutional rights of the Defendant.

We believe that the prosecutor's references to equal protection, the presumption of innocence and proof beyond a reasonable doubt, in the context in which the remarks were made, were improper. In arguing to the jury, counsel may not misstate the law nor may counsel argue law which is not related to the facts of the case. See State v. Adkins, 653 S.W.2d 708, 714 (Tenn. 1983); Gray v. State, 191 Tenn. 526, 235 S.W.2d 20, 24 (1950); State v. Byerley, 658 S.W.2d 134, 140 (Tenn. Crim. App. 1983); see also David Louis Raybin, Tennessee Criminal Practice and Procedure, § 29.30. The trial judge, however, issued a limiting instruction to the jury that he would instruct them as to the law and he did, in fact, do so with regard to the presumption of innocence and the burden of proof.

## B. Effect of Prosecutorial Misconduct

As we set forth above, the relevant inquiry for reviewing prosecutorial misconduct is whether the improper conduct could have affected the verdict to the prejudice of the defendant. Harrington, 215 Tenn. at 340, 385 S.W.2d at 759. We generally consider five factors in making that determination. See Judge, 539 S.W.2d at 344.

### 1. Conduct Complained of Viewed in Context and in Light of the Facts and Circumstances of the Case

In our discussion of the categories of alleged misconduct above, we concluded that there were several instances of prosecutorial misconduct. The prosecutor improperly stated his personal beliefs regarding the credibility of the Defendant's proof. In addition, the prosecutor misstated the law as it relates to the presumption of innocence and the burden of proof. We must take note, however, that the record in this case contains nearly three thousand pages. It is also readily apparent from the record that this case was "forcefully" tried by counsel with some history of antagonism. Viewed in context, the prosecutor's improper conduct was slight and relatively infrequent. Moreover, given the sheer volume of the record, we do not believe that any undue emphasis was placed upon the instances of misconduct. Furthermore, the prosecutorial misconduct did not prevent the Defendant from presenting a thorough defense.

### 2. Curative Measures Taken by the Trial Court

Several somewhat improper remarks made by the prosecutor were met with curative instructions from the trial court. As we stated above, juries are

presumed to follow such instructions. See Compton, 642 S.W.2d at 746; Frazier, 566 S.W.2d at 551. We point out, though, that some improper comments on the credibility of the Defendant's proof which were objected to by defense counsel were not met with curative instructions. The lack of a curative instruction causes us some concern, but the number of improper remarks not cured is small. The prejudice suffered by the Defendant as a result of these uncured remarks seems overwhelmed by the amount of proof set forth at trial.

### 3. Intent of the Prosecutor

As we noted above, it appears from the record that there is some history of antagonism between the prosecutor and defense counsel. It is quite obvious that this trial was "hard-fought" by both attorneys. There is nothing in the record, however, to indicate that the prosecutor acted in bad faith in making the improper remarks. Rather, it seems that the prosecutor had momentary lapses of judgment on a few occasions over the course of a trial which lasted nearly three weeks. We recognize that the prosecutor made errors, but we discern no improper intent on behalf of the prosecutor.

### 4. Cumulative Effect

On appeal, the Defendant raises several issues other than prosecutorial misconduct. We have discussed those issues in full detail earlier in this opinion. Not surprisingly, our analysis revealed other errors which occurred during the course of the Defendant's three-week trial. We are satisfied, however, that the cumulative effect of the prosecutorial misconduct and the other errors did not affect the verdict to the prejudice of the Defendant. From our review of the extensive record in this case, it plainly appears that this case was often

-104-

contentious. Both the State and the Defendant presented compelling and persuasive evidence and arguments. We cannot escape the conclusion that this case presented a classic jury question. The jury resolved that question against the Defendant. We cannot conclude that the errors which occurred during trial cumulatively rose to a level influencing either the evidence available to the jury or the jury's reasoning process so as to affect their verdict.

### 5. Relative Strength or Weakness of the Case

As we stated above, the evidence adduced at trial in this case presented a classic jury question. The State offered eyewitness testimony demonstrating that the Defendant had shot the victim and the manner in which the altercation had taken place. The Defendant readily admitted that he had shot the victim, but presented proof in support of a claim of self-defense. The case essentially boiled down to a credibility judgment by the jury. The jury resolved the case against the Defendant. While it is true that there are inconsistencies in the testimony of the witnesses for the State and there is even testimony from State's witnesses which favors the Defendant, the same can be said of the Defendant's proof. From our review of the record, we conclude that the State presented a reasonably strong case against the Defendant. The question of the Defendant's guilt was, without a doubt, hotly contested at trial, but there was persuasive evidence presented by the State to support the jury's verdict.

### C. Conclusion Regarding Prosecutorial Misconduct

Having examined the instances of prosecutorial misconduct in light of the Judge factors, we conclude that the improper conduct of the prosecutor did not

affect the verdict to the prejudice the Defendant.  See Harrington, 215 Tenn. at

340, 385 S.W.2d at 759.  Accordingly, the sixth issue on appeal lacks merit.

## VIII.  SENTENCING

In the seventh issue, the Defendant challenges the trial court's imposition

of a twenty-three year, Range I sentence.  The Defendant first complains that the

trial court's sentencing procedure was flawed.  He also argues that the trial court

misapplied the relevant enhancement and mitigating factors.  As a result, he

contends that his sentence is excessive.  We agree.

When an accused challenges the length, range, or the manner of service

of a sentence, this court has a duty to conduct a de novo review of the sentence

with a presumption that the determinations made by the trial court are correct.

Tenn. Code Ann. § 40-35-401(d).  This presumption is "conditioned upon the

affirmative showing in the record that the trial court considered the sentencing

principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d

166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a)

the evidence, if any, received at the trial and the sentencing hearing; (b) the

presentence report; (c) the principles of sentencing and arguments as to

sentencing alternatives; (d) the nature and characteristics of the criminal conduct

involved; (e) any statutory mitigating or enhancement factors; (f) any statement

that the defendant made on his own behalf; and (g) the potential or lack of

potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principals set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In order to address this issue fully, we must examine the manner in which the trial court conducted the sentencing of the Defendant. The sentencing hearing was originally set for August 24, 1995. Shortly before that date, the Defendant prepared and filed a detailed, fifteen-page sentencing memorandum. Included with this memorandum were numerous letters of support from friends of the Defendant and members of his community. The State had already filed a notice of the enhancement factors asserted to be applicable. At the beginning of the August 24 sentencing hearing, a controversy arose over certain alleged courtroom conduct in the wake of the verdict. The trial court requested additional information and argument from both the prosecution and the defense in order to determine whether to consider the allegations for sentencing purposes. As a result, the sentencing of the Defendant was continued to a later date.

On September 6, 1995, the actual sentencing hearing was conducted. Having weighed the allegations surrounding the courtroom conduct and the arguments in favor of and against its relevance for sentencing, the trial judge

stated that he was not considering the allegations to arrive at a sentence for the Defendant. After ruling on those allegations, the trial court immediately began to announce the enhancement factors deemed applicable. The trial court applied the following four enhancement factors:

> (1)    The Defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range;
> (2)    The Defendant employed or possessed a firearm during the commission of the offense;
> (3)    The Defendant had no hesitation about committing a crime when the risk to human life was high; and,
> (4)    The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

Tenn. Code Ann. § 40-35-114(1), (9), (10), (16). The trial judge stated that he would give great weight to the enhancement factor dealing with employment of a firearm. He gave little weight to the remaining three factors.

After the trial court had ruled with regard to enhancement factors, defense counsel interjected argument concerning those factors. The Defendant submitted that the trial court had misapplied the factors. The trial court overruled the Defendant's arguments and, faced with continued argument by defense counsel, stated, "Let me finish this sentencing." The Defendant voiced a desire to be heard on the subject. At that point, the trial court exclaimed, "You have been heard!" The trial court then instructed defense counsel to sit down.

After that heated exchange, the trial court proceeded to consider the mitigating factors proposed by the Defendant in the sentencing memorandum submitted to the trial court. Those factors were:

> (1)    The Defendant acted under strong provocation;
> (2)    Substantial grounds exist tending to excuse or justify the Defendant's criminal conduct, though failing to establish a defense;

-108-

(3)     The Defendant was motivated by a desire to provide necessities for his family or himself;

(4)     The Defendant was suffering from a mental or physical condition that significantly reduced his culpability for the offense;

(5)     The Defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct;

(6)     The Defendant acted under duress;

(7)     The Defendant has a good reputation in the community;

(8)     The community believes that the Defendant possesses the full potential for rehabilitation; and,

(9)     The Defendant has no prior serious criminal record.

Tenn. Code Ann. § 40-35-113(2), (3), (7), (8), (11), (12), (13). The trial court's ruling with regard to the mitigating factors consisted of reading the proposed factor and then stating, "I can't find that." The only extended comments by the trial judge regarding mitigating factors came in response to the Defendant's asserted non-statutory mitigating factors concerning his relationship with his community which were supported by more than twenty letters from community members.

I [the trial judge] ordinarily don't read letters, because the writer is not subjected to cross-examination, although I did read these. I found it unusual that five of the letters were written by those who rent from the defendant. Eleven contained the word -- describing Mr. Joslin's behavior as uncharacteristic, and twelve used the words remorseful or regret. Two showed their absolute unfamiliarity with the duties of this Court by phrases such as it's unfortunate that someone of his caliber has been forced to defend himself against these charges and he should be completely exonerated.

No argument concerning the mitigating factors was permitted.

After ruling on the mitigating factors, the trial court asked the Defendant if he had anything he wished to say. Defense counsel pointed out that the trial court had apparently already come to a conclusion with regard to sentencing, and

the Defendant chose not to say anything further. The trial court then imposed a twenty-three year, Range I sentence with the Department of Correction.[19]

On appeal, the Defendant first challenges the sentencing procedure itself. We agree that the manner in which the trial court conducted the sentencing hearing is troubling. The trial court made no effort to allow either the State or the Defendant to present evidence. See Tenn. Code Ann. § 40-35-209(b). The trial court severely limited argument concerning the relevant sentencing principles and, at one point, flatly prohibited defense counsel from arguing. We recognize that the Defendant had previously submitted a detailed sentencing memorandum which included extensive argument concerning the relevant sentencing principles. If the hearing became merely repetitive of the submitted memorandum, the trial judge could have, as part of his discretion in controlling argument, limited argument during sentencing to material which had not been covered adequately by the sentencing memorandum. To fail to allow for the presentation of evidence and argument nearly altogether was improper in our view.

Given the thorough sentencing memorandum submitted by the Defendant and the extensive record in this case, however, we believe that we do have enough information for an effective review of the Defendant's challenge to his sentence. Initially, we note that we will review the Defendant's sentence without affording the presumption of correctness to the trial court's ruling. See Tenn. Code Ann. § 40-35-401(d); State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992) (if the trial court applies inappropriate factors or otherwise fails to

---

[19] Second-degree murder is a class A felony. Tenn. Code Ann. § 39-13-210(b). Thus, the applicable sentencing range for the Defendant was fifteen to twenty-five years. Tenn. Code Ann. § 40-35-112(a)(1).

follow the Sentencing Reform Act of 1989, the presumption of correctness falls). From our review of the record, we cannot conclude that the trial court considered all of the relevant sentencing principles applicable to this case. Aside from the procedural problems outlined above, the trial court denied the Defendant's proposed mitigating factors almost summarily. As we shall explain later, several of those factors merited application. At the very least, given the Defendant's detailed analysis and support of mitigating factors in his memorandum, the trial judge should have explained his reasoning rather than issue a cursory denial.

Aside from the complaint about sentencing procedure, the Defendant also challenges the enhancement factors applied by the trial court. From our review of the record, we conclude that the trial court properly applied the four enhancement factors. The record indicates that the Defendant does have prior misdemeanor convictions. As a result, the "previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range" factor is applicable. Tenn. Code Ann. § 40-35-114(1). Moreover, the record is clear that the Defendant "employed a firearm during the commission of the offense." Tenn. Code Ann. § 40-35-114(9). The Defendant argues that the use of a firearm is inherent in the offense of second-degree murder and, as such, that enhancement factor is inapplicable. See Tenn. Code Ann. § 40-35-114. That argument has been rejected by this Court on several occasions. See, e.g., State v. Butler, 900 S.W.2d 305, 312-13 (Tenn. Crim. App. 1994); State v. Raines, 882 S.W.2d 376, 385 (Tenn. Crim. App. 1994).

The Defendant also challenges the application of the two remaining enhancement factors, that he had "no hesitation about committing a crime when

the risk to human life was high" and that the "crime was committed under circumstances under which the potential for bodily injury was great." Tenn. Code Ann. § 40-35-114(10) and (16). He again argues that these factors are inherent in the offense of second-degree murder. The Defendant's argument ignores that the proof at trial demonstrated that there was another individual, Gary Massengill, in the direction in which the he fired his pistol. Both of these enhancement factors may be applied when there are individuals other than the victim in the area and subject to injury. See State v. Ruane, 912 S.W.2d 766, 784 (Tenn. Crim. App. 1995); State v. Bingham, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995); State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995); State v. Makoka, 885 S.W.2d 366, 373 (Tenn. Crim. App. 1994).

We turn now to the mitigating factors proposed by the Defendant but rejected by the trial court. From our review of the facts of this case as they unfolded at trial, particularly the history between the Defendant and the victim, three of the mitigating factors proposed by the Defendant seem intertwined. Those three factors are "the Defendant acted under strong provocation," "substantial grounds exist tending to excuse or justify the Defendant's criminal conduct though failing to establish a defense," and "the Defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated his conduct." Tenn. Code Ann. § 40-35-113(2), (3), (11). We believe that these three intertwined mitigating factors are applicable to some degree given the history between the Defendant and the victim and the alleged actions of the victim, largely unrefuted by the State, in the months prior to the shooting. Although the jury rejected the Defendant's claim of self-defense,

the relationship and history between the victim and the Defendant most certainly played a significant role in the commission of this offense.

Likewise, we believe that two of the Defendant's proposed non-statutory mitigating factors are applicable. Those two factors are that the Defendant has a good reputation in his community and the members of his community believe he possesses the full potential for rehabilitation. Tenn. Code Ann. § 40-35-113(13). The Defendant attached more than twenty letters of support from members of his community to his sentencing memorandum. The trial court apparently attributed some type of deceptive motive to those letters. We fail to see any such deceit in the letters.[20] In our view, they express genuine positive feelings about the Defendant.

We find that the remaining mitigating factors proposed by the Defendant are not applicable. For instance, the Defendant argues that he was motivated by a desire to provide necessities for his family or himself. Tenn. Code Ann. § 40-35-113(7). More specifically, the Defendant contended that he was motivated by a desire to provide safety for his family and himself. We believe that this argument is substantially encompassed by the Defendant's self-defense claim, which was rejected by the jury.

---

[20] We note that the trial judge stated on the record that he ordinarily does not read letters submitted by defendants in support of mitigating factors. Given that the trial judge stated that he did read this Defendant's letters, we find no error in this regard in the case sub judice. We do, however, suggest that the trial judge should read such letters in all cases. If the characteristics indicate that such letters should be given little weight, the trial judge may make an appropriate finding, but he should certainly endeavor to consider sentencing evidence and argument presented by defendants, including letters of support from members of their community.

In addition, the Defendant argues that he was suffering from a mental condition which significantly reduced his culpability. Tenn. Code Ann. § 40-35-113(8). The Defendant points to Dr. Engum's testimony detailing his passive-aggressive and narcissistic personality traits and what role those traits played in his perception of the victim's behavior. While those psychological characteristics might very well help to explain the Defendant's perception of the victim's behavior and his own reaction to that behavior, we do not believe that the Defendant's personality traits significantly reduced his culpability for the offense.

The Defendant also contends that he acted under duress. Tenn. Code Ann. § 40-35-113(12). The Defendant's contention ignores the language of the remainder of that mitigating factor. That statutory mitigating factor, in its entirety, reads as follows: "The defendant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime." Id. (emphasis added). In the present case, we find that the alleged threatening conduct of the victim against the Defendant and his family does not qualify as "duress or domination" within the meaning of this statutory mitigating factor.

Lastly, the Defendant argues that his lack of a prior serious criminal record should be considered in mitigation. Tenn. Code Ann. § 40-35-113(13). The Defendant cites several cases in support of his argument. State v. Moss, 727 S.W.2d 229 (Tenn. 1986); State v. Makoka, 885 S.W.2d 366 (Tenn. Crim. App. 1994); State v. Dykes, 803 S.W.2d 250 (Tenn. Crim. App. 1990); State v. Willis, 735 S.W.2d 818 (Tenn. Crim. App. 1987); State v. Jenkins, 733 S.W.2d 528 (Tenn. Crim. App. 1987). Our reading of these cases does not support the

Defendant's contention. In each of the cases, the defendant had <u>no</u> prior criminal record rather than no prior <u>serious</u> criminal record. <u>Moss</u>, 727 S.W.2d at 233 (indicating that, other than traffic offenses, the defendant had prior arrests but no convictions); <u>Makoka</u>, 885 S.W.2d at 374; <u>Dykes</u>, 803 S.W.2d at 258; <u>Willis</u>, 735 S.W.2d at 822; <u>Jenkins</u>, 733 S.W.2d at 533-34. We agree that the lack of a criminal history may be considered as a mitigating factor pursuant to Tennessee Code Annotated section 40-35-113(13). <u>Bingham</u>, 910 S.W.2d at 453. Given the Defendant's prior misdemeanor convictions, however, we do not find this mitigating factor to be applicable in his case.

With regard to the Defendant's personal history, we note that he was born in Knoxville, Tennessee in 1930 and was sixty-three years old at the time of the commission of the offense. Other than the misdemeanor convictions from 1973, he has no criminal record. He was married to his first wife for approximately twenty-four years and raised four children to adulthood. He is presently married to his second wife. They have been married for approximately twenty-two years and have two adolescent children. The Defendant has always been self-employed and was a successful, semi-retired businessman at the time of the offense. Judging from the letters of support submitted by the Defendant, he is a well-liked and respected member of his church and community.

After considering the entire record in this case and weighing the applicable enhancement and mitigating factors, we conclude that the trial court's imposition of a twenty-three year sentence was excessive. We believe that a sentence of

seventeen years as a Range I standard offender is more appropriate under the circumstances of this case.[21]

## IX. CONCLUSION

We recognize that this appeal presents a very difficult, close case. The Defendant has made a number of compelling arguments. In fact, we agree with the Defendant that several errors occurred during the course of his trial. Yet, as we stated above, this case strikes us as one involving a classic jury question. From our review of the record, we do not believe that the errors which occurred during the Defendant's trial unfairly affected the evidence available to the jury or the credibility of the Defendant's proof in such a way as to undermine our confidence in the jury's verdict.

Thus, for the reasons set forth in the discussion above, we conclude that the Defendant's issues on appeal provide no basis for reversing his conviction. We do, however, find that the trial court erred in sentencing the Defendant. We therefore affirm his conviction for second-degree murder but modify his sentence to seventeen (17) years as a Range I standard offender with the Department of Correction. This case is remanded to the trial court solely for entry of a judgment consistent with this opinion.

---

[21] The Defendant argues that he should be classified as an especially mitigated offender. See Tenn. Code. Ann. § 40-35-109(a). Because we have found enhancement factors applicable in his case, the Defendant does not qualify as an especially mitigated offender. Tenn. Code Ann. § 40-35-109(a)(2); State v. Braden, 867 S.W.2d 750, 763 (Tenn. Crim. App. 1993).

_____
DAVID H. WELLES, JUDGE


CONCUR:


_____
DAVID G. HAYES, JUDGE


_____
THOMAS T. WOODALL, JUDGE